TEXTILE WORKERS UNION OF AMERICA *v.*
DARLINGTON MANUFACTURING CO. ET AL.

No. 37. Argued December 9–10, 1964.—
Decided March 29, 1965.*

---

*Together with No. 41, *National Labor Relations Board* v. *Darlington Manufacturing Co. et al.*, also on certiorari to the same court.

*Irving Abramson* argued the cause for petitioner in No. 37. With him on the brief were *Everett E. Lewis, Donald Grody* and *Leonard Greenwald.*

*Dominick L. Manoli* argued the cause for petitioner in No. 41. With him on the briefs were *Solicitor General Cox, Arnold Ordman, Norton J. Come* and *Nancy M. Sherman.*

*Sam J. Ervin, Jr.,* and *Stuart N. Updike* argued the cause for respondents in both cases. With *Mr. Ervin* on the brief for Darlington Manufacturing Co. was *Thornton H. Brooks.* With *Mr. Updike* on the brief for Deering Milliken, Inc., were *John Lord O'Brian, Hugh B. Cox* and *John R. Schoemer, Jr.*

*J. Albert Woll, Robert C. Mayer, Theodore J. St. Antoine* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging reversal.

Briefs of *amici curiae,* urging affirmance, were filed by *Rowland F. Kirks* for the American Textile Manufacturers Institute, and by *Gerard D. Reilly* for the Chamber of Commerce of the United States.

Mr. Justice Harlan delivered the opinion of the Court.

We here review judgments of the Court of Appeals setting aside and refusing to enforce an order of the National Labor Relations Board which found respondent Darlington guilty of an unfair labor practice by reason of having permanently closed its plant following petitioner union's election as the bargaining representative of Darlington's employees.

Darlington Manufacturing Company was a South Carolina corporation operating one textile mill. A majority of Darlington's stock was held by Deering Milliken, a New York "selling house" marketing textiles produced by others.[1] Deering Milliken in turn was controlled by Roger Milliken, president of Darlington, and by other members of the Milliken family.[2] The National Labor Relations Board found that the Milliken family, through Deering Milliken, operated 17 textile manufacturers, including Darlington, whose products, manufactured in 27 different mills, were marketed through Deering Milliken.

In March 1956 petitioner Textile Workers Union initiated an organizational campaign at Darlington which the company resisted vigorously in various ways, including threats to close the mill if the union won a representation election.[3] On September 6, 1956, the union won an

---

[1] Deering Milliken & Co. owned 41% of the Darlington stock. Cotwool Manufacturing Corp., another textile manufacturer, owned 18% of the stock. In 1960 Deering Milliken & Co. was merged into Cotwool, the survivor being named Deering Milliken, Inc.

[2] The Milliken family owned only 6% of the Darlington stock, but held a majority stock interest in both Deering Milliken & Co. and Cotwool, see n. 1, *supra*.

[3] The Board found that Darlington had interrogated employees and threatened to close the mill if the union won the election. After the decision to liquidate was made (see *infra*), Darlington employees were told that the decision to close was caused by the election, and

election by a narrow margin. When Roger Milliken was advised of the union victory, he decided to call a meeting of the Darlington board of directors to consider closing the mill. Mr. Milliken testified before the Labor Board:

> "I felt that as a result of the campaign that had been conducted and the promises and statements made in these letters that had been distributed [favoring unionization], that if before we had had some hope, possible hope of achieving competitive [costs] . . . by taking advantage of new machinery that was being put in, that this hope had diminished as a result of the election because a majority of the employees had voted in favor of the union . . . ." (R. 457.)

The board of directors met on September 12 and voted to liquidate the corporation, action which was approved by the stockholders on October 17. The plant ceased operations entirely in November, and all plant machinery and equipment were sold piecemeal at auction in December.

The union filed charges with the Labor Board claiming that Darlington had violated §§ 8 (a)(1) and (3) of the National Labor Relations Act by closing its plant,[4]

---

they were encouraged to sign a petition disavowing the union. These practices were held to violate § 8 (a)(1) of the National Labor Relations Act, n. 4, *infra*, and that part of the Board decision is not challenged here.

[4] National Labor Relations Act, §§ 8 (a)(1) and (3), as amended, 61 Stat. 140 (1947), 29 U. S. C. §§ 158 (a)(1) and (3) (1958 ed.), provide in pertinent part:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title];

. . . . .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

and § 8 (a)(5) by refusing to bargain with the union after the election.[5] The Board, by a divided vote, found that Darlington had been closed because of the antiunion animus of Roger Milliken, and held that to be a violation of § 8 (a)(3).[6] The Board also found Darlington to be part of a single integrated employer group controlled by the Milliken family through Deering Milliken; therefore Deering Milliken could be held liable for the unfair labor practices of Darlington.[7] Alternatively, since Darlington was a part of the Deering Milliken enterprise, Deering Milliken had violated the Act by closing part of its business for a discriminatory purpose. The Board ordered back pay for all Darlington employees until they obtained substantially equivalent work or were put on preferential hiring lists at the other Deering Milliken mills. Respondent Deering Milliken was ordered to bargain with the union in regard to details of compliance with the Board order. 139 N. L. R. B. 241.

---

[5] The union asked for a bargaining conference on September 12, 1956 (the day that the board of directors voted to liquidate), but was told to await certification by the Board. The union was certified on October 24, and did meet with Darlington officials in November, but no actual bargaining took place. The Board found this to be a violation of § 8 (a)(5). Such a finding was in part based on the determination that the plant closing was an unfair labor practice, and no argument is made that § 8 (a)(5) requires an employer to bargain concerning a purely business decision to terminate his enterprise. Cf. *Fibreboard Paper Products Corp.* v. *Labor Board,* 379 U. S. 203.

[6] Since the closing was held to be illegal, the Board found that the gradual discharges of all employees during November and December constituted § 8 (a)(1) violations. The propriety of this determination depends entirely on whether the decision to close the plant violated § 8 (a)(3).

[7] Members Leedom and Rodgers agreed with the trial examiner that Deering Milliken was not a single employer. Member Rodgers dissented in arguing that Darlington had not violated § 8 (a)(3) by closing.

268

On review, the Court of Appeals, sitting *en banc,* set aside the order and denied enforcement by a divided vote. 325 F. 2d 682. The Court of Appeals held that even accepting *arguendo* the Board's determination that Deering Milliken had the status of a single employer, a company has the absolute right to close out a part or all of its business regardless of antiunion motives. The court therefore did not review the Board's finding that Deering Milliken was a single integrated employer. We granted certiorari, 377 U. S. 903, to consider the important questions involved. We hold that so far as the Labor Relations Act is concerned, an employer has the absolute right to terminate his entire business for any reason he pleases, but disagree with the Court of Appeals that such right includes the ability to close part of a business no matter what the reason. We conclude that the cause must be remanded to the Board for further proceedings.

Preliminarily it should be observed that both petitioners argue that the Darlington closing violated § 8 (a) (1) as well as § 8 (a)(3) of the Act. We think, however, that the Board was correct in treating the closing only under § 8 (a)(3).[8] Section 8 (a)(1) provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" § 7 rights.[9] Naturally, certain business decisions will, to some

---

[8] The Board did find that Darlington's discharges of employees following the decision to close violated § 8 (a)(1). See n. 6, *supra.*

[9] NLRA § 7, as amended, 29 U. S. C. § 157 (1958 ed.), provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3) [section 158 (a)(3) of this title]."

degree, interfere with concerted activities by employees. But it is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8 (a)(1) is violated. See, *e. g., Labor Board* v. *Steelworkers,* 357 U. S. 357; *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793. A violation of § 8 (a)(1) alone therefore presupposes an act which is unlawful even absent a discriminatory motive. Whatever may be the limits of § 8 (a)(1), some employer decisions are so peculiarly matters of management prerogative that they would never constitute violations of § 8 (a)(1), whether or not they involved sound business judgment, unless they also violated § 8 (a)(3). Thus it is not questioned in this case that an employer has the right to terminate his business, whatever the impact of such action on concerted activities, if the decision to close is motivated by other than discriminatory reasons.[10] But such action, if discriminatorily motivated, is encompassed within the literal language of § 8 (a)(3). We therefore deal with the Darlington closing under that section.

## I.

We consider first the argument, advanced by the petitioner union but not by the Board, and rejected by the Court of Appeals, that an employer may not go completely out of business without running afoul of the Labor Relations Act if such action is prompted by a desire to

---

[10] It is also clear that the ambiguous act of closing a plant following the election of a union is not, absent an inquiry into the employer's motive, inherently discriminatory. We are thus not confronted with a situation where the employer "must be held to intend the very consequences which foreseeably and inescapably flow from his actions . . ." (*Labor Board* v. *Erie Resistor Corp.,* 373 U. S. 221, 228), in which the Board could find a violation of § 8 (a)(3) without an examination into motive. See *Radio Officers* v. *Labor Board,* 347 U. S. 17, 42–43; *Teamsters Local* v. *Labor Board,* 365 U. S. 667, 674–676.

avoid unionization.[11] Given the Board's findings on the issue of motive, acceptance of this contention would carry the day for the Board's conclusion that the closing of this plant was an unfair labor practice, even on the assumption that Darlington is to be regarded as an independent unrelated employer. A proposition that a single businessman cannot choose to go out of business if he wants to would represent such a startling innovation that it should not be entertained without the clearest manifestation of legislative intent or unequivocal judicial precedent so construing the Labor Relations Act. We find neither.

So far as legislative manifestation is concerned, it is sufficient to say that there is not the slightest indication in the history of the Wagner Act or of the Taft-Hartley Act that Congress envisaged any such result under either statute.

As for judicial precedent, the Board recognized that "[t]here is no decided case directly dispositive of Darlington's claim that it had an absolute right to close its mill, irrespective of motive." 139 N. L. R. B., at 250. The only language by this Court in any way adverting to this problem is found in *Southport Petroleum Co.* v. *Labor Board,* 315 U. S. 100, 106, where it was stated:

> "Whether there was a *bona fide* discontinuance and a true change of ownership—which would terminate the duty of reinstatement created by the Board's order—or merely a disguised continuance of the old employer, does not clearly appear . . . ."

The courts of appeals have generally assumed that a complete cessation of business will remove an employer

---

[11] The Board predicates its argument on the finding that Deering Milliken was an integrated enterprise, and does not consider it necessary to argue that an employer may not go completely out of business for antiunion reasons. Brief for National Labor Relations Board, p. 3, n. 2.

from future coverage by the Act. Thus the Court of Appeals said in these cases: The Act "does not compel a person to become or remain an employee. It does not compel one to become or remain an employer. Either may withdraw from that status with immunity, so long as the obligations of any employment contract have been met." 325 F. 2d, at 685. The Eighth Circuit, in *Labor Board* v. *New Madrid Mfg. Co.,* 215 F. 2d 908, 914, was equally explicit:

> "But none of this can be taken to mean that an employer does not have the absolute right, at all times, to permanently close and go out of business . . . for whatever reason he may choose, whether union animosity or anything else, and without his being thereby left subject to a remedial liability under the Labor Management Relations Act for such unfair labor practices as he may have committed in the enterprise, except up to the time that such actual and permanent closing . . . has occurred." [12]

The AFL–CIO suggests in its *amicus* brief that Darlington's action was similar to a discriminatory lockout, which is prohibited " 'because designed to frustrate organizational efforts, to destroy or undermine bargaining representation, or to evade the duty to bargain.' " [13] One of the purposes of the Labor Relations Act is to prohibit the discriminatory use of economic weapons in an effort to obtain future benefits. The discriminatory lockout designed to destroy a union, like a "runaway shop," is a lever which has been used to discourage collective employee activities

---

[12] In *New Madrid* the business was transferred to a new employer, which was held liable for the unfair labor practices committed by its predecessor before closing. The closing itself was not found to be an unfair labor practice.

[13] Brief for AFL–CIO, p. 7, quoting from *Labor Board* v. *Truck Drivers Local,* 353 U. S. 87, 93. This brief was incorporated by reference as Point I of the petitioner union's brief in this Court.

in the future. But a complete liquidation of a business yields no such future benefit for the employer, if the termination is bona fide.[14] It may be motivated more by spite against the union than by business reasons, but it is not the type of discrimination which is prohibited by the Act. The personal satisfaction that such an employer may derive from standing on his beliefs and the mere possibility that other employers will follow his example are surely too remote to be considered dangers at which the labor statutes were aimed.[15] Although employees may be prohibited from engaging in a strike under certain conditions, no one would consider it a violation of the Act for the same employees to quit their employment *en masse,* even if motivated by a desire to ruin the employer. The very permanence of such action would negate any future economic benefit to the employees. The employer's right to go out of business is no different.

We are not presented here with the case of a "runaway shop,"[16] whereby Darlington would transfer its

---

[14] The Darlington property and equipment could not be sold as a unit, and were eventually auctioned off piecemeal. We therefore are not confronted with a sale of a going concern, which might present different considerations under §§ 8 (a)(3) and (5). Cf. *John Wiley & Sons, Inc.* v. *Livingston,* 376 U. S. 543; *Labor Board* v. *Deena Artware, Inc.,* 361 U. S. 398.

[15] Cf. NLRA § 8 (c), 29 U. S. C. § 158 (c) (1958 ed.). Different considerations would arise were it made to appear that the closing employer was acting pursuant to some arrangement or understanding with other employers to discourage employee organizational activities in their businesses.

[16] *E. g., Labor Board* v. *Preston Feed Corp.,* 309 F. 2d 346; *Labor Board* v. *Wallick,* 198 F. 2d 477. An analogous problem is presented where a department is closed for antiunion reasons but the work is continued by independent contractors. See, *e. g., Labor Board* v. *Kelly & Picerne, Inc.,* 298 F. 2d 895; *Jays Foods, Inc.* v. *Labor Board,* 292 F. 2d 317; *Labor Board* v. *R. C. Mahon Co.,* 269 F. 2d 44; *Labor Board* v. *Bank of America,* 130 F. 2d 624; *Williams Motor Co.* v. *Labor Board,* 128 F. 2d 960.

work to another plant or open a new plant in another locality to replace its closed plant.[17] Nor are we concerned with a shutdown where the employees, by renouncing the union, could cause the plant to reopen.[18] Such cases would involve discriminatory employer action for the purpose of obtaining some benefit from the employees in the future.[19] We hold here only that when

[17] After the decision to close the plant, Darlington accepted no new orders, and merely continued operations for a time to fill pending orders. 139 N. L. R. B., at 244.

[18] *E. g., Labor Board* v. *Norma Mining Corp.*, 206 F. 2d 38. Similarly, if all employees are discharged but the work continues with new personnel, the effect is to discourage any future union activities. See *Labor Board* v. *Waterman S. S. Co.*, 309 U. S. 206; *Labor Board* v. *National Garment Co.*, 166 F. 2d 233; *Labor Board* v. *Stremel*, 141 F. 2d 317.

[19] All of the cases to which we have been cited involved closings found to have been motivated, at least in part, by the expectation of achieving future benefits. See cases cited in notes 16, 18, *supra*. The two cases which are urged as indistinguishable from *Darlington* are *Labor Board* v. *Savoy Laundry*, 327 F. 2d 370, and *Labor Board* v. *Missouri Transit Co.*, 250 F. 2d 261. In *Savoy Laundry* the employer operated one laundry plant where he processed both retail laundry pickups and wholesale laundering. Once the laundry was marked, all of it was processed together. After some of the employees organized, the employer discontinued most of the wholesale service, and thereafter discharged some of his employees. There was no separate wholesale department, and the discriminatory motive was obviously to discourage unionization in the entire plant. *Missouri Transit* presents a similar situation. A bus company operated an interstate line and an intrastate shuttle service connecting a military base with the interstate terminal. When the union attempted to organize all of the drivers, the shuttle service was sold and the shuttle drivers were discharged. Although the two services were treated as separate departments, it is clear from the facts of the case that the union was attempting to organize all of the drivers, and the discriminatory motive of the employer was to discourage unionization in the interstate service as well as the shuttle service.

an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice.[20]

## II.

While we thus agree with the Court of Appeals that viewing Darlington as an independent employer the liquidation of its business was not an unfair labor practice, we cannot accept the lower court's view that the same conclusion necessarily follows if Darlington is regarded as an integral part of the Deering Milliken enterprise.

The closing of an entire business, even though discriminatory, ends the employer-employee relationship; the force of such a closing is entirely spent as to that business when termination of the enterprise takes place. On the other hand, a discriminatory partial closing may have

---

[20] Nothing we have said in this opinion would justify an employer's interfering with employee organizational activities by threatening to close his plant, as distinguished from announcing a decision to close already reached by the board of directors or other management authority empowered to make such a decision. We recognize that this safeguard does not wholly remove the possibility that our holding may result in some deterrent effect on organizational activities independent of that arising from the closing itself. An employer may be encouraged to make a definitive decision to close on the theory that its mere announcement before a representation election will discourage the employees from voting for the union, and thus his decision may not have to be implemented. Such a possibility is not likely to occur, however, except in a marginal business; a solidly successful employer is not apt to hazard the possibility that the employees will call his bluff by voting to organize. We see no practical way of eliminating this possible consequence of our holding short of allowing the Board to order an employer who chooses so to gamble with his employees not to carry out his announced intention to close. We do not consider the matter of sufficient significance in the overall labor-management relations picture to require or justify a decision different from the one we have made.

repercussions on what remains of the business, affording employer leverage for discouraging the free exercise of § 7 rights among remaining employees of much the same kind as that found to exist in the "runaway shop" and "temporary closing" cases. See *supra,* pp. 272–273. Moreover, a possible remedy open to the Board in such a case, like the remedies available in the "runaway shop" and "temporary closing" cases, is to order reinstatement of the discharged employees in the other parts of the business.[21] No such remedy is available when an entire business has been terminated. By analogy to those cases involving a continuing enterprise we are constrained to hold, in disagreement with the Court of Appeals, that a partial closing is an unfair labor practice under § 8 (a)(3) if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect.

While we have spoken in terms of a "partial closing" in the context of the Board's finding that Darlington was part of a larger single enterprise controlled by the Milliken family, we do not mean to suggest that an organizational integration of plants or corporations is a necessary prerequisite to the establishment of such a violation of § 8 (a)(3). If the persons exercising control over a plant that is being closed for antiunion reasons (1) have an interest in another business, whether or not affiliated with or engaged in the same line of commercial activity as the closed plant, of sufficient substantiality to give promise of their reaping a benefit from the discouragement of unionization in that business; (2) act to close their plant with the purpose of producing such a result; and

---

[21] In the view we take of these cases we do not reach any of the challenges made to the Board's remedy afforded here.

(3) occupy a relationship to the other business which makes it realistically foreseeable that its employees will fear that such business will also be closed down if they persist in organizational activities, we think that an unfair labor practice has been made out.

Although the Board's single employer finding necessarily embraced findings as to Roger Milliken and the Milliken family which, if sustained by the Court of Appeals, would satisfy the elements of "interest" and "relationship" with respect to other parts of the Deering Milliken enterprise, that and the other Board findings fall short of establishing the factors of "purpose" and "effect" which are vital requisites of the general principles that govern a case of this kind.

Thus, the Board's findings as to the purpose and foreseeable effect of the Darlington closing pertained *only* to its impact on the Darlington employees. No findings were made as to the purpose and effect of the closing with respect to the employees in the other plants comprising the Deering Milliken group. It does not suffice to establish the unfair labor practice charged here to argue that the Darlington closing necessarily had an adverse impact upon unionization in such other plants. We have heretofore observed that employer action which has a foreseeable consequence of discouraging concerted activities generally [22] does not amount to a violation of § 8 (a) (3) in the absence of a showing of motivation which is aimed at achieving the prohibited effect. See *Teamsters Local* v. *Labor Board,* 365 U. S. 667, and the concurring opinion therein, at 677. In an area which trenches so closely upon otherwise legitimate employer prerogatives, we consider the absence of Board findings on this score a fatal defect in its decision. The Court of Appeals for its part

---

[22] See n. 10, *supra.*

did not deal with the question of purpose and effect at all, since it concluded that an employer's right to close down his entire business because of distaste for unionism, also embraced a partial closing so motivated.

Apart from this, the Board's holding should not be accepted or rejected without court review of its single employer finding, judged, however, in accordance with the general principles set forth above. Review of that finding, which the lower court found unnecessary on its view of the cause, now becomes necessary in light of our holding in this part of our opinion, and is a task that devolves upon the Court of Appeals in the first instance. *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474.

In these circumstances, we think the proper disposition of this cause is to require that it be remanded to the Board so as to afford the Board the opportunity to make further findings on the issue of purpose and effect. See, *e. g., Labor Board* v. *Virginia Elec. & Power Co.,* 314 U. S. 469, 479–480. This is particularly appropriate here since the cases involve issues of first impression. If such findings are made, the cases will then be in a posture for further review by the Court of Appeals on all issues. Accordingly, without intimating any view as to how any of these matters should eventuate, we vacate the judgments of the Court of Appeals and remand the cases to that court with instructions to remand them to the Board for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART took no part in the decision of these cases.

MR. JUSTICE GOLDBERG took no part in the consideration or decision of these cases.