**FORREST INDUSTRIES, INC., a corporation, Plaintiff,**

**v.**

**LOCAL UNION NO. 3–436 INTERNATIONAL WOODWORKERS OF AMERICA, AFL–CIO, a Labor Organization, and Western States Regional Council No. 111, International Woodworkers of America, AFL–CIO, a Labor Organization, Defendants.**

**Civ. No. 65–37.**

United States District Court
D. Oregon.

Aug. 15, 1966.

Norman J. Wiener, King, Miller, Anderson, Nash & Yerke, Portland, Or., for plaintiff.

William M. Dale, Jr., Hicks, Tongue, Dale & Strader, Portland, Or., for defendants.

## OPINION

KILKENNY, District Judge:

Forrest Industries, Inc. (Company) charges Local Union No. 3–436 (Local Union) and Western States Regional Council No. 111 (Regional Council) with a violation of the working agreement between the Company and the Local Union.

Local Union at all times represented the employees of Company, and Regional Council is composed of numerous locals

within an eight state area, one of which is Local Union. Federal jurisdiction is present due to the fact the action is brought under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185.

In the fall of 1964, Company concluded that economy and efficiency necessitated a curtailment in its work force, and that the job classification of "floorman" on both the swing and graveyard shifts was to be eliminated, with the two men holding the job classifications of "stock rustler" and "glue mixer" performing substantially all the work previously assigned the "floorman." This decision by Company was unilateral.

The Shop Steward, upon notification of Company's plans, stated to Company officials that Local Union would have objections. Following a series of meetings, at which no agreement was reached, a strike meeting was called by Local Union, and a vote in favor of a strike resulted. An attempt by the Federal Mediation and Conciliation Service to avert a work stoppage was unsuccessful, and a strike began January 25, 1965. The contract between Local Union and Company recited that no strike would take place until after compliance with all procedural steps [1] for grievance settlement, as set out in the Working Agreement. The Company contends that Local Union was obligated not to strike during the terms of the contract unless: (a) a grievance arose under the terms of the contract, and (b) the grievance procedure provided for in the contract was followed. It insists that the curtailment in its work force was not a "grievance" (or a matter subject to grievance procedure), but was a prerogative of management not subject to negotiation. The Company concludes that the

strike was unlawful and a breach of contract, and that defendants Local Union and Regional Council intentionally caused the breach. As separate causes of action, Company alleges that two of its divisions have been damaged in substantial sums.

Local Union and Regional Council contend that the change instituted by Company affected the employment conditions of not only those directly involved, but of many other employees as well. They also insist that the change involved conditions of employment and that it, therefore, constituted a grievance or subject of grievance within the meaning of the Collective Bargaining Agreement. Local Union and Regional Council argue that the procedures provided for grievances were fully complied with, and that the strike was, therefore, in accordance with the terms of the Collective Bargaining Agreement.

## ISSUES

A. Did the change effectuated by Company constitute a grievance or a subject of grievance, within the meaning of the Collective Bargaining Agreement?

B. Was the grievance procedure, as set out by the Collective Bargaining Agreement, fully complied with?

■ A. Since the solution to the first issue revolves around the meaning of the word "grievance," we must turn to the legal definition of that term. It is generally held that the word is not a term of art, and has no connotation different from its meaning in ordinary use. Butte Miners' Union No. 1, etc. v. Anaconda Co., 159 F.Supp. 431, 435 (D.Mont.1958); Petition of Labor Mediation Board, 365 Mich. 645, 114 N.W.2d 183, 187 (1962); Timken Roller Bearing Co. v. NLRB, 161 F.2d 949, 955 (6th Cir. 1947).

---

1. Which are substantially as follows: (a) presentation of grievance by Shops Steward to foreman or superintendent; (b) failing agreement, the matter to be taken up with the employer's committee; (c) failing agreement, the matter to be referred to the Business Agent for adjustment with the Company; (d) failing agreement, each side was to present a written statement of the facts to the other, and both statements were to be placed before the employees for their consideration; (e) stop work meeting to be held at the plant to give the employees an opportunity to meet and receive the written statements of facts; (f) no strike was to be called until all the above steps were taken, followed by an employee vote whereby a majority of the union members voted to strike.

There are varying interpretations of what actually constitutes a "grievance." Some seem to infer that the term refers to collective rather than individual or group complaints, or to major demands relative to wages, hours and working conditions. NLRB v. Associated Machines, 219 F.2d 433, 436 (6th Cir. 1955); Pittsburgh City Fire Fighters, etc. v. Barr, 408 Pa. 325, 184 A.2d 588 (1962). However, other cases indicate that minor matters or secondary disputes (in contrast to broad issues such as wages, hours and working conditions) constitute a "grievance." West Texas Utilities Co. v. NLRB, 92 U.S.App.D.C. 224, 206 F.2d 442, 446 (1953); NLRB v. Kearney & Trecker Corp., 237 F.2d 416, 420 (7th Cir. 1956).

■ Here, by the terminology used by the parties in their working agreement, it seems quite clear that they intended the term "grievance" to encompass, not only major demands relative to wages, hours and working conditions, *but also* individual and group complaints. Subsection c. of Article II of the "Working Agreement" between Company and Local Union states:

"The Shop Steward may present the grievance of the *member* or members, under his jurisdiction, to the foreman or superintendent for adjustment. * * *" (Emphasis supplied.)

Webster's New Collegiate Dictionary (11th ed. 1959) defines grievance as follows:

"Suffering, or its infliction; affliction. Aggrieved state; anger. A cause of uneasiness and complaint; a wrong."

■ As above delineated, Company decided to eliminate the job of "floorman" on both its swing and graveyard shifts, for reasons of economy. Because of this the workmen permanently assigned to the job classification of "stock rustler" were required to assume the duties previously performed by the floorman. In addition, the "glue mixer" on each of these shifts was required to assume duties formerly performed by the stock rustler. As a result, the duties and job content of the "stock rustler" and "glue mixer" classifications were substantially altered, which increased their work load and job performance. Another repercussion of the change was that, as a result of the "bumping down" procedure within the seniority system, one man at the bottom of the seniority list was eventually discharged. Manifestly, the worker eventually discharged because of this reclassification and job abolishment "suffered." Moreover, one would be hard put to deny that the workers who lost their regular positions, or those whose duties were substantially altered, had a reasonable and logical "cause of uneasiness and complaint." It appears quite clear, from the fact that several of the employees complained almost immediately after learning of these changes, that they considered themselves to be "afflicted," "aggrieved" and "wronged." Clearly, several of Company's employees has a legitimate "grievance," at least according to the common and ordinary meaning of the term.

■ Conceding, as I must, that those in charge of management have a right to "improve, control and direct production," it does not necessarily follow that a company's employees will not be "wronged" by certain changes, even if the employees have no voice in the changes before they are made. Within the last decade, many substantial inroads have been made into what were formerly known as "traditional prerogatives of business." Order of Railroad Telegraphers v. Chicago & Northwestern R.R., 362 U.S. 330, 80 S.Ct. 761 (1960); Textile Workers Union of America v. Darlington, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

■ While these cases are not precisely in point, they present certain guidelines which, I believe, stand for the principle that employers may not, with impunity, act unilaterally in such a way as to directly affect their employees, simply because business efficiency or economy may so dictate. For that matter, it would seem that the negotiation of griev-

ances is an essential part of the bargaining process. Local 833, UAW–AFL–CIO, Intern. Union, etc. Automobile Workers of America, et al. v. NLRB, 112 U.S.App.D.C. 107, 300 F.2d 699 (1962), cert. denied 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962). This principle was earlier recognized in United Steelworkers of America v. Warrior & Gulf Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The latter gives full fledged support to the doctrine that disagreement between parties, over a matter not specifically excluded from the grievance procedure, and the subject of which is not an absolute prerogative of management, requires compliance with the grievance procedure outlined in the bargaining agreement.

Furthermore, by inference, if nothing else, the contract gave the employees the right to use the grievance procedure if they "felt they had a grievance." There is no substance to the Company's argument that the matter of a "grievance" could be presented only if both employer and employees agreed that it was a grievance, or that there was no grievance if the employer unilaterally considered the matter solely a management prerogative.

Company argues that the provisions of the contract recognize a right of Company to curtail employment. True enough, by the terms of the contract, seniority would apply and wage rates would be subject to renegotiation, if a substantial change in job functions occurred. The fact that the Company may have had the right to curtail employment does not mean that such a provision precluded Local Union from presenting a "grievance," following the grievance procedure and eventually calling a strike. Although all parts of the contract must be read together, a Court will not read a "no-strike" clause into a contract, where none otherwise exists.

The previous employment curtailments, urged by Company, bear no resemblance to the one which precipitated this action. Furthermore, Local Union did, in fact, assert grievances after two of the previous curtailments. What occurred on the previous curtailments cannot, by any stretch of the imagination, be viewed as a practical interpretation placed on the contract by the parties.

B. The Working Agreement, by Article II, prohibits a strike until all steps have been taken as outlined in the grievance procedure. Pertinent components of the grievance procedure are set forth in the footnote.[2] The parties are in complete agreement on the following facts: On November 19, 1964, Company notified Local Union of the job classification change and the chairman of the "Shop Committee" and asked for a meeting between the Shop Committee and the employer's committee. The parties agreed to a meeting of the respective

---

2. * * * * *

"e. In the event that the Union Representatives and the Management are unable to agree, within what either party considers a reasonable time, the facts as known to the Union shall be placed in writing and given to the Management, and the facts as known to the Management shall be placed in writing and given to the Union. Both statements shall be placed before the employees by the Union for their consideration. The Employer agrees to close the plant for from two (2) to four (4) hours, so that all employees may attend the meeting and receive the written statements of facts. The time of day for closing the plant shall be mutually agreed upon.

"f. No strike shall be called or sanctioned by the Union or any of its members, and no lockouts shall be called by the employer or employers until all provisions of Article II have been carried out, and in no event shall a strike occur without approval by majority of the employees who are members of the Union. Voting on a strike shall be conducted by the Union member employees. If the employees vote to strike after considering the written statements of facts provided for in paragraph (e) of this Article, the Employer shall be notified of said strike by registered mail, addressed to his place of business. No strike shall occur or no lockout shall be instituted by the Employer until after forty-eight (48) hours have elapsed from the time said notice was mailed."

* * * * *

committees on November 23rd. Then, the job classification change was put into effect by the plaintiff. Later that day, the two committees met. Subsequently, on December 14th another meeting was held between the committees. Again, on January 12, 1965, still another meeting was held between the committees at which meeting *written statements of the respective positions of the parties were exchanged,* obviously pursuant to the provisions of Footnote 2e. On January 14th, Local Union posted a notice of a stop-work meeting to be held on January 15th. On that date, a meeting was held by representatives of Company, Local Union and the Federal Mediation and Conciliation Service. Also represented was Regional Council. The "stop-work" meeting was held on the afternoon of the same day. At such meeting, a strike ballot of Company's plywood employees was taken, the vote being 122 in favor of the strike and 38 against. On January 18th, Local Union advised Company that a strike would occur if there was not a settlement of pending issues. Patently, the latter procedure was followed pursuant to the requirements of Footnote 2f. Meetings and correspondence following the strike vote were of no significance and the strike occurred at Company's plywood plant at Dillard, Oregon, on January 26th.

 The main thrust of the Company's argument is that each of the parties took an exclusive position and refused to change during the course of the negotiations. Even assuming the correctness of the statement of the parties' positions, it does not follow that the parties did not, in fact, comply with the grievance procedure as outlined in the agreement. The fact that the Company may never have conceded that the problem rose to the dignity of a "grievance" is not important, in my opinion, as long as the required steps were taken and the procedure required by the agreement was exhausted, Local Union could strike. This would be true even if the parties had taken mutually exclusive positions throughout the negotiations. The fallacy

of the Company's position is put in proper focus by pointing the lens at a party who might never recognize a grievance, and thus completely circumvent the effective use of that part of the agreement. Moreover, the record before me is replete with instances where Company recognized that the parties were, in fact, following the procedure outlined in the contract. The fact that the Company might not have been notified of the impending strike by registered mail, as required by the procedure, is so inconsequential that comment is unnecessary. Company does not claim it did not know of the impending strike. The record would preclude such a contention.

Since I find in defendants' favor on Issues A and B, it is unnecessary for me to pass on whether Regional Council could be held jointly responsible, with Local Union, for a breach of the contract.

This opinion shall serve as my findings and conclusions. Defendants are entitled to a judgment of dismissal.