**BRUCE DUNCAN COMPANY,
INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 77–2583.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 13, 1978.

Decided Feb. 1, 1979.

Patrick J. Hannan, New York City, for petitioner.

Susan S. McDonald, Atty., N. L. R. B., Washington, D. C., (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Robert G. Sewell, Atty., N. L. R. B., Washington, D. C., on brief), for respondent.

Before WINTER, RUSSELL and HALL, Circuit Judges.

WINTER, Circuit Judge:

The principal issue we must decide is whether, having found that an employer's closing of its office was in retaliation against its employees for their union activities but that nevertheless the proof was insufficient under *Textile Workers Union of America v. Darlington Manufacturing Co.,* 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), to constitute a violation of § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), the Board may retain jurisdiction of the case for an unstated period to reconsider and modify its finding of no violation of § 8(a)(3) should subsequent events make such action appropriate. We decide that it may not. Secondarily, we decide that there was substantial evidence on the record as a whole to support the Board's finding of § 8(a)(1) violations.

Thus, on the employer's petition to set aside the order of the Board and the Board's cross-petition to enforce its order, we enforce the order in part and set it aside in part.

I.

Bruce Duncan Company, Inc. (the company) is a California corporation doing business as a customs broker, international air transport association agency and international freight forwarder at various offices across the country. One of the offices, located at John F. Kennedy Airport in New York, employed approximately ten persons. During May 1974, some of the employees discussed among themselves the possibility of unionizing the office. In early August, a few employees spoke with a local officer of the International Brotherhood of Teamsters, who provided them with union authorization cards to sign. By Friday, August 9, a majority of the employees at the JFK office had signed union cards, and it was decided that they would not report for work on the following Monday, August 12, until union officials had the opportunity to discuss recognition and a contract with JFK Office Manager John Suazo. But on August 12, Suazo refused to recognize the union on the basis of the signed cards, and the employees set up a picket line in front of the office. On August 15, Suazo was informed by a superior that the JFK office would probably be closed by the end of the

month. The final decision was made on August 22, and the next day the employees were informed of the immediate closing of the office.

The administrative law judge found the company guilty of three unfair labor practices. He found that, in violation of § 8(a)(1), the company had threatened one employee, who had mentioned the possibility of unionization of the JFK office, with the closing of the office if unionization were successful, and had later threatened a striking employee with physical harm to him and his family. The third unfair labor practice found by the administrative law judge was the closing of the JFK office. He rejected the company's contention that the office had been closed for economic reasons because of continuing operating losses. Rather, he found that the closing was in retaliation against the employees for their union activity, and was thus a violation of § 8(a)(3) of the Act.[1]

The Board sustained the findings of the administrative law judge in part and rejected them in part. It upheld the findings of two violations of § 8(a)(1) by threats to employees. The Board ruled, however, that no violation of § 8(a)(3) had been committed by the closing of the JFK office. The Board agreed with the administrative law judge that the operating losses asserted by the company were not the true reason for the closing of the JFK office, and that the closing was in fact a retaliatory action against the employees. This retaliatory motive, the Board reasoned, would have been sufficient to constitute a § 8(a)(3) violation if the closing of the JFK office had been temporary. But, the Board continued, if the closing of the office was permanent, then under the doctrine of *Textile Workers Union v. Darlington Manufacturing Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), the closing would not constitute a violation of § 8(a)(3) unless the employer was motivated by a purpose to chill unionism in the other offices and such a chilling effect was reasonably foreseeable. The Board found as a matter of fact that the JFK office had been permanently closed and that the company was not motivated by a desire to chill union activity in its other offices. It therefore rejected the administrative law judge's finding of a § 8(a)(3) violation.

Nevertheless, the Board did not finally dismiss the charge of a § 8(a)(3) violation. Instead, it concluded its decision with the following paragraph:

Our decision in this case is based on a finding that the Respondent has permanently closed its JFK Airport office. The possibility does exist, however, that the Respondent will resume operations at the JFK Airport at some future time. We shall therefore retain jurisdiction herein so that, if such an event should occur, we may consider its legal implications.

233 N.L.R.B. No. 176 (1977).[2]

## II.

In *Darlington*, the Supreme Court held that the closing by an employer of one plant, even if motivated by an anti-union animus, does not necessarily violate § 8(a)(3). The Court reasoned that even though the closing is in retaliation against the employees at that plant for their union activity, the employer will realize no future gain at the plant from such retaliation, since the plant has been permanently closed. The Court recognized, however, that the employer can realize some incidental gain if the retaliatory closing deters union activity by employees at the other plants that remain open. Thus, the Court ruled that a partial closing of the employer's business would violate § 8(a)(3) only if (1) it is "motivated by a purpose to chill unionism in any of the remaining plants" and (2) "the employer may reasonably have foreseen that such closing would likely have

---

1. A fourth unfair labor practice charged in the complaint was rejected by the administrative law judge for lack of sufficient evidence.

2. The Board has purported to retain jurisdiction in similar circumstances on at least two prior occasions. Motor Repair, Inc., 168 N.L.R.B. 1082 (1968); A. C. Rochat Co., 163 N.L.R.B. 421 (1967). This is apparently the first time, however, that a court of appeals has been asked to decide the propriety of the practice.

that effect." 380 U.S. at 275, 85 S.Ct. at 1002.

Of course, the Court's reasoning is applicable only when the closing of the plant is an actual closing and not merely a temporary suspension of operations. An employer who shuts down his plant in retaliation for union activity and subsequently reopens it does stand to gain from the chilling effect on any future union activity by employees at that plant, and the "closing" becomes in reality a discriminatory action against employees for engaging in protected activity—a classic unfair labor practice under § 8(a)(3). Thus, the *Darlington* Court was careful to note that it was not presented with the case of a "runaway shop," in which the employer transfers work from the closed plant to another plant, or a discharge of all employees followed by the hiring of new personnel. *See id.* at 272–73, 85 S.Ct. 994.

█ In the case before us, the Board determined that the closing of the JFK office was "permanent." Applying the *Darlington* analysis, the Board found that the closing was in retaliation for the union activity of the employees at the JFK office, but that the company was not motivated by a desire to chill unionism at its other offices. The Board thus held that no violation of § 8(a)(3) had been committed. The company strenuously contends that once the Board found the closing to be lawful, it was required to dismiss the complaint instead of retaining jurisdiction. We agree.

█ On its face, the National Labor Relations Act requires the Board to dismiss a complaint when it finds the challenged action of the employer to be lawful. Section 10(c) of the Act, 29 U.S.C. § 160(c), provides in pertinent part:

> If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint.

The Board's retention of jurisdiction despite a finding that the employer has behaved lawfully is plainly contrary to this statutory requirement. Moreover, the retention of jurisdiction runs afoul of the six-month statute of limitations in § 10(b) of the Act, 29 U.S.C. § 160(b). By retaining jurisdiction and thus reserving the right to reopen proceedings against the company without issuing a new complaint, the Board violates the statutory requirement that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board."

The Board's position is that the retention of jurisdiction is necessary to effectuate the purposes of § 8(a)(3), as construed in *Darlington*. The Board contends that an apparent permanent closing of a plant may later be seen in retrospect as only a temporary shutdown, designed to eliminate or deter union activity at the plant. The determination whether a purported closing is permanent or only temporary is, according to the Board, often difficult to make only six months after the date of the closing. Thus, the Board argues that a device like the retention of jurisdiction is necessary to ensure that employers acting in bad faith do not shut down a plant under circumstances indicating a permanent closing and then reopen it once the Board's jurisdiction has expired.

█ In some cases there may be difficulty in determining, only six months after the date of the closing, whether a closing is permanent or temporary, but we believe that this difficulty is inherent in the provisions of the Act. Congress has subjected the activity of employers and labor organizations to sweeping regulation, but it also has included the requirements of § 10 to ensure that the regulation be conducted according to established procedures, free of any undue harassment by the Board. The statutory direction is clear, but if it is in fact unworkable, the remedy lies with Congress which could broaden the reach of § 8(a)(3) or relax the statute of limitations in § 10(b). But under the Act as currently

written, we must conclude that the Board, in the name of enforcing the Act more effectively, may not avoid procedural requirements inserted for the protection of the regulated parties.

■ The Board is correct in asserting that it possesses broad authority and discretion to fashion and impose remedies upon transgressing employers. *See Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). But factually and legally, we do not think that application of this general principle sustains the Board's attempted reservation of jurisdiction in the instant case. First, as a factual matter, we question whether the device of retaining jurisdiction would really be as helpful to the Board as it contends. The device is designed to foil an unscrupulous employer who plans to reopen his plant shortly after he has obtained a final favorable ruling from the Board. But surely at some point in the future the Board must completely dismiss the complaint and relinquish its jurisdiction. Thus, the retention of jurisdiction may forestall, but it cannot completely prevent, the bad faith reopening of the plant.[3]

■ As a legal matter, the Board's remedial power is *necessarily predicated upon a finding* by the Board that the employer has engaged in an unfair labor practice. *See, e. g., id.* at 215–16, 85 S.Ct. 398; *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346–47, 73 S.Ct. 287, 97 L.Ed. 377 (1953); *Over-*

*nite Transportation Co. v. NLRB*, 372 F.2d 765, 770 (4 Cir.), *cert. denied*, 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101 (1967).[4] Here, the Board has found that an unfair labor practice was *not* committed in the closing of the office. That finding is dispositive. The power to fashion appropriate remedies does not extend to a broad supervisory authority to police the conduct of law-abiding employers without regard for the procedures specifically and carefully detailed in § 10.

We therefore set aside that portion of the Board's order which purports to retain jurisdiction over the matter of the closing of the JFK office, and we remand the case to the Board with instructions to dismiss the charge of a violation of § 8(a)(3).

### III.

The administrative law judge found that the company twice threatened employees for engaging in union activity, in violation of § 8(a)(1). First, in June or July of 1974, Suazo told employee Alfred Gross that unionization of the JFK office could lead to a closing of the office. Second, on August 13, 1974, Chicago Office Manager Rolf Wagschel, who had been brought into the JFK office to assist Suazo during the work stoppage, approached employee Richard Kurz, who was relaxing near the picket line, made a threatening gesture to him, and threatened harm to his family. These findings were upheld by the Board.

3. Significantly, it has not been a mere six months but rather well over four years, since the closing of the JFK office. This lengthy period of time is attributable in part to a delay of two and one-half years between the issuance of the administrative law judge's decision and the order of the Board. Still, the Board has found no new evidence to suggest that the August 1974 closing of the JFK office was not permanent, and it has not indicated when in the future it intends to relinquish jurisdiction.

4. Thus, the dictum of the Supreme Court in *Mine, Mill & Smelter Workers Local 15 v. Eagle-Picher Mining & Smelting Co.*, 325 U.S. 335, 341, 65 S.Ct. 1166, 1169, 89 L.Ed. 1649 (1945), cited by the Board, which acknowledges that the Board may have the power to "frame an order which by its terms required modification should conditions change," was clearly intend-

ed in the context of a case in which the Board has already found an unfair labor practice committed.

The Board's reliance on the doctrine of Collyer Insulated Wire, 192 N.L.R.B. 837 (1971), is similarly misplaced. That doctrine, which has received judicial approval, *see, e. g., Associated Press v. NLRB*, 160 U.S.App.D.C. 396, 492 F.2d 662 (1974), holds that the Board will stay its hand when an alleged unfair labor practice falls within the scope of an arbitration procedure established by a collective bargaining agreement. In such a case, the Board retains jurisdiction solely for the purpose of reviewing the outcome of the arbitration process. Clearly, this practice of the Board does not involve the retention of jurisdiction after a determination on the merits that the employer has not committed an unfair labor practice.

The company does not deny that these allegations, if proved, would establish violations of § 8(a)(1). It contends, however, that the findings are not supported by substantial evidence in the record as a whole. We think otherwise.

We do not share the company's characterization of the administrative law judge's analysis of the evidence and his findings of fact as "a blanket credibility finding" against the company. While he did indicate that Suazo, the principal witness for the company, was not a generally credible witness, this conclusion was based on specifically detailed flaws found in Suazo's testimony. Surely there is no indication, as the company suggests, that the administrative law judge mechanically discredited the company's witnesses simply on the ground that they were testifying for the company.

Nor are we overly concerned by the fact that Gross could not recall certain details of his conversation with Suazo or that witnesses to Wagschel's assault on Kurz did not agree precisely on the nature of the threatening gesture. Judicial factfinders commonly are faced with the problem of resolving conflicts or imperfections in human recollection of fleeting events, and the administrative law judge's resolution in this case was not unreasonable.

Since we find sufficient support for the Board's findings of two violations of § 8(a)(1), its order with respect thereto will be enforced.

*ENFORCEMENT GRANTED IN PART AND DENIED IN PART.*