Dominick A. PALANCIA and John A. Woods, Plaintiffs,

v.

ROOSEVELT RACEWAY, INC., John Murray, as President of Plumbers Local Union No. 457 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, and Robert J. Friedberg, Defendants.

No. CV 80–0872.

United States District Court, E.D. New York.

Nov. 26, 1982.

**550**

Kaplowitz & Galinson, Daniel Galinson, Mineola, N.Y., for plaintiffs.

Dretzin & Kauff, P.C., Alexander Rosenberg, New York City, for Roosevelt Raceway.

Speno, Goldberg, Moore, Margules & Corcoran, P.C., Mineola, N.Y. (Robert W. Corcoran, Michael H. Soroka, Mineola, N.Y., of counsel), for Murray and Friedberg.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Plaintiffs Dominick A. Palancia ("Palancia") and John A. Woods ("Woods") contend that their collective bargaining agent, defendant Local Union No. 457 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada ("Local 457"), violated § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1978) [L.M.R.A. § 301], when it allegedly failed to contest their discharge and thereby breached its duty to represent them fairly. Plaintiffs were fired on September 28, 1979 by defendant Roosevelt Raceway, Inc. ("Raceway"), their employer, because they had not bothered to secure a license that is required both by State law and by the terms of their collective bargaining agreement ("agreement"). Consequently, Messrs. Palancia and Woods filed suit seeking, respectively, reinstatement as journeyman plumber and foreman of the Raceway's Plumbing Department, as well as compensatory and punitive damages totaling $2.25 million and $2.5 million. Local 457 and defendants John Murray, its president, and Robert J. Friedberg ("Friedberg"), its business manager, now move for an order granting summary judgment. Fed.R.Civ.P. 56(b).[1] "Upon review of the entire record," these defendants have met their burden of demonstrating that "there is no genuine issue of material fact," *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444–45 (2d Cir.1980); *Karim v. United States Lines, Inc.,* 111 L.R.R.M. (BNA) 2496, 2496–97 (E.D.N.Y. Aug. 31, 1982); Fed.R.Civ.P. 56(c). Thus, summary judgment will be granted.

### Facts

In approximately 1967, Messrs. Palancia and Woods obtained jobs as journeymen

---

1. The Raceway has not joined in the motion.

plumbers at the Raceway. A member of Local 457 for 30 years, Mr. Woods was promoted to foreman in 1971. Both he and Mr. Palancia were employed continuously by the Raceway from 1967 to 1979.[2] In September, 1979, the three-year agreement in effect between Local 457 and the Raceway required that, as a "continuing condition precedent" to their employment, all covered employees—including the plaintiffs—obtain a license pursuant to New York State Racing and Wagering Board regulations. N.Y.Admin.Code tit. 9, § 4101.24 (1981). Licenses were renewed annually.[3] Messrs. Palancia and Woods had knowledge of this requirement, for in each of the preceding 12 years they had applied for and received licenses. Woods Affidavit, ¶¶ 3–5. Neither plaintiff claims that he possessed or had requested a valid license by September 26, 1982, the apparent date on which the Raceway's personnel manager and director of industrial relations, Walter E. Penny, learned that the plaintiffs had been working without licenses for more than nine months. Woods Affidavit, ¶¶ 3, 6–7. As a result, Mr. Penny informed defendant Friedberg the next day that the Raceway had decided to discharge the plaintiffs. Woods Affidavit, ¶ 14. At first, Mr. Friedberg protested. But, after conferring with Murray Goldberg, Esq., Local 457's lawyer, he concluded that the union had no choice but to acquiesce in the Raceway's decision. Deposition of Robert J. Friedberg (March 4, 1981), at 12–16; Deposition of Walter E. Penny (March 4, 1981), at 24–25. Messrs. Palancia and Woods were fired on September 28, 1979. Local 457 did not file a grievance on their behalf.[4]

### Discussion

Our starting point is *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), which sets forth a two-step test for determining whether a union or employer is liable under L.M.R.A. § 301. To establish liability, a plaintiff must show *both* that (1) the employer breached the collective bargaining agreement *and* that (2) the union's decision not to pursue the employee's grievance was "arbitrary, discriminatory or in bad faith." *Id.* at 190–92, 87 S.Ct. at 916–18. Clearly, failure to prevail on the first step obviates the need to consider the second. Thus we begin by deciding whether a breach occurred.

Messrs. Palancia and Woods contend that the Raceway violated its agreement with Local 457 by terminating them for failure to obtain a 1979 raceway license. Issued on an annual basis, these licenses are required by N.Y.Admin.Code tit. 9, § 4101.-24 (1981), which states in part:

(a) No person shall participate in the affairs of any association or corporation licensed by the New York State Harness Racing Commission to conduct harness race meetings at which pari-mutuel betting is permitted as director, agent or employee of such track licensee, unless such person shall have received an occupational license from the commission.

\* \* \* \* \* \*

(c) It shall be the responsibility of each track licensee to prevent any person not holding an occupational license from doing or performing any act or acts at its track.

Originally filed with the Secretary of State on September 5, 1974, this rule was promulgated under the authority of N.Y.Unconsol. Laws § 8010 (McKinney 1979 & Supp.

---

**2.** The preceding and much of what follows is to be found in the Affidavit of John A. Woods (hereinafter, "Woods Affidavit"), dated October 6, 1982, and accompanied by five exhibits. Dominick A. Palancia submitted a much briefer affidavit, also dated October 6, 1982, which incorporates by reference most of the Woods Affidavit.

**3.** According to N.Y.Unconsol. Laws § 8010(1) (McKinney Supp.1981), the license period runs from January 3. However, N.Y.Admin.Code tit. 9, § 4101.24(d) (1981) starts the license year on the "first day of racing for the season."

**4.** Although it is clear that, under Article 17 of the collective bargaining agreement, it *could* have.

1981).[5] Article 14 of the collective bargaining agreement in effect at the time of plaintiffs' termination [6] tied the Wagering Board's requirements to employment at Roosevelt Raceway in the following language:[7]

> Each employee covered by this Agreement shall procure such license or permit as required by any such law, rule or regulation, and in the event any license fee is prescribed therefor, the same shall be paid for by each employee covered by this Agreement as a continuing condition precedent to such employment.

Local 457 maintains that this provision of the agreement, read in light of State regulations, *requires* the Raceway to discharge employees lacking the requisite license. Whether Article 14 imposes such an absolute duty on the employer is a matter that need not be decided. It will suffice to observe that the "condition precedent" language of this article gives the Raceway the power, at its discretion, to terminate unlicensed employees. Article 5 of the agreement explicitly reserves to management "the right to discharge, suspend and otherwise discipline any employee for just cause." Obviously, "just cause" includes failure to possess a license that the agreement and State regulations require each employee—as part of his or her own responsibility—to obtain. Equally as clear, the language quoted from Article 5 reserves to the Raceway the discretion to discharge unlicensed employees, or to discipline them by means of a lesser sanction. In areas traditionally considered the preserve of management, contract ambiguities should be resolved in the employer's favor. Hiring, firing, and discipline constitute one such area. *N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed.

893 (1937). *Cf., Textile Workers Union v. Darlington,* 380 U.S. 263, 269, 85 S.Ct. 994, 999, 13 L.Ed.2d 827 (1965) (plant closing). Moreover, in view of Article 5 of the agreement, it is apparent that the Raceway successfully bargained for the power to determine, within the limits of fundamental fairness, which sanctions to impose.

This Court's discussion would normally end here, with the conclusion that Messrs. Palancia and Woods had not surmounted the first hurdle of *Vaca v. Sipes, supra,* were it not necessary to demonstrate that certain facts alleged by plaintiffs—even if true—would not forestall the granting of summary judgment. In brief, Messrs. Palancia and Woods appear to claim that the Raceway's long-standing practices modified the agreement and thereby transformed management's actions, albeit in line with the letter of Articles 5 and 14, into a breach of the agreement's altered, unwritten "spirit." Those alleged past practices include:

(1) "[a]t various times and in various ways," distributing blank license application forms to all, or at least to all incumbent, Raceway employees. Woods Affidavit, ¶¶ 4–5 & nn. 1, 4.

(2) Each year from January 1 to April 1, permitting employees to perform their assigned tasks, even though they had not yet obtained a license. Woods Affidavit, n. 2.

(3) Allowing Gene E. Vice, currently maintenance superintendent at the Raceway, to work for nine months one season without a license. Woods Affidavit, ¶ 9.

(4) Permitting an employee in the Racetrack Security Department to work until July 13, 1979 before obtaining a license. Woods Affidavit, n. 3.

**5.** This section empowers the New York State Racing and Wagering Board, by rule, to license those who work at harness tracks like Roosevelt Raceway. We note that the rule only requires raceways to exclude unlicensed employees. It does not impose the further responsibility of affirmatively obtaining licenses for them.

**6.** The agreement was effective from July 1, 1978 through June 30, 1981. In essence, it was

an extension of the three-year pact immediately preceding it. Letter from Walter E. Penny to Robert J. Friedberg (October 24, 1978).

**7.** We note again and also that this agreement imposes upon each employee the duty of procuring such license as may be required by law and does not impose any responsibility on the Raceway or the Union.

(5) Laying off, rather than discharging, "per diem" workers in certain departments until they had received licenses. Woods Affidavit, ¶ 13 & n. 4.

Collective bargaining agreements "are contracts that remain subject to the general principles of contract law." 6 T. Kheel, *Labor Law* § 26.04[3], at 26–69, 26–70 (1982). Moreover, under L.M.R.A. § 301, this Court has the power to construe Article 14 of the agreement and determine whether the Raceway breached it. *Vaca v. Sipes,* 386 U.S. at 196, 87 S.Ct. at 920.[8] Thus, plaintiffs' contentions might be supported by State common law concepts of modification, waiver and estoppel, or by one of the special procedural safeguards—for instance, protecting employees from being disciplined for violating rules not regularly enforced—developed by federal labor arbitrators. *See* R. Gorman, *Basic Text on Labor Law* 548–51 (1976); Summers, *Collective Agreements and the Law of Contracts,* 78 Yale L.J. 525, 573–74 (1969).

However, after careful consideration of the points alleged by the plaintiffs—taking them, as we must, to be true, *Johnson v. General Motors Corp.,* 641 F.2d 1075, 1077 (2d Cir.1981)—this Court concludes that they neither raise a factual issue precluding summary judgment nor effect, as a matter of law, a modification of the agreement or otherwise cause its breach.

First of all, Messrs. Palancia and Woods were not exempted from the contractually and legally imposed licensing requirement (or their duty to obtain any required licenses), regardless of how and to what extent the Raceway itself furnished individual employees with blank application forms. Article 14 of the agreement imposes the duty to obtain a license on each employee, individually, and it does so unequivocally. Union members are charged with knowledge of the contents of their collective bargaining agreement. *Newgent v. Modine Manufacturing Co.,* 86 L.R.R.M. 2468, 2474 (7th Cir.1974); *Tribbett v. Local 7928, United Steelworkers of America,* 106 L.R.R.M. 2292 (W.D.Tenn.1980); *Pawlak v. Local 764, International Brotherhood of Teamsters,* 444 F.Supp. 807 (M.D.Pa.1977), *aff'd,* 571 F.2d 572 (3d Cir.1978). The plaintiffs may in fact be contending that the Raceway's behavior erased the duty placed on their shoulders. But this claim, too, will not succeed, for it fails to recognize that the duty was not imposed solely by the agreement; it also was imposed by State law. The employer could not effect a waiver of the latter.

Second, even though the Raceway may have exposed itself to sanctions by permitting unlicensed employees to work on the premises for the first three months of the year, the portions of Mr. Penny's deposition appended to Mr. Woods' affidavit support the conclusion that (1) most employees were licensed by April 1; (2) management actively sought out those who had not obtained licenses by that date; and (3) at no time were a significant number of employees permitted to work well into the calendar year (through July, for instance) without licenses.

Third, those who did work after April 1 without licenses, and the "per diem" workers laid off but not fired, could not have effected a modification of the Local 457 contract because they were not party to it. Plaintiffs may not claim that their detailed, 13-page collective bargaining agreement was altered by management's unilateral actions vis-a-vis another group of employees covered by a different agreement, if any at all.[9]

Finally, it should be stressed that none of the points raised by the plaintiffs rises to

---

**8.** Despite the existence of an arbitration clause in Article 17 of the agreement, *Vaca* does not seem to authorize referral of this matter to an arbitrator—at least not until we find that the union has breached its duty to bargain in good faith. *Id.* 386 U.S. at 196, 87 S.Ct. at 920. We do not reach this question.

**9.** Plaintiffs in fact do not set forth any allegations concerning the existence or contents of these other agreements. However, considering that they have had more than two years in which to conduct discovery, we are loath to credit to this omission the most helpful of several possible inferences.

the level of a factual issue. Even if, over the years, a few unlicensed Local 457 members had worked beyond the three-month "grace" period (and no one claims that, apart from the matter before us, this ever occurred), our decision would remain the same. More is needed before common law doctrines or the procedural rules of arbitration will convert management's discretion in a particular case to decline to exercise all of its authority into a waiver for all time of the prerogatives clearly granted to it by contract.

■ In summary, we hold that Messrs. Palancia and Woods have been unable to demonstrate a breach of agreement, and therefore have failed to satisfy the first part of the *Vaca v. Sipes* test. It is unnecessary to consider whether, assuming a breach had occurred, Local 457 did not represent plaintiffs fairly. *Cf., Steinman v. Spector Freight System, Inc.,* 476 F.2d 437, 439 (2d Cir.1973).[10]

As our discussion shows, plaintiffs have raised no genuine issue of material fact. Fed.R.Civ.P. 56(c). Summary judgment, for the moving defendant, therefore, is appropriate.

SO ORDERED.

10. However, were this Court to reach the issue, it would resolve it in favor of the moving defendants. The Supreme Court has variously interpreted the second part of the *Vaca* test to require a showing that the union engaged in "fraud, deceitful action or dishonest conduct," *Hoffman v. Lonza, Inc.,* 658 F.2d 519, 522 (7th Cir.1981) (union negligence not enough) (*quoting Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America v. Lockridge,* 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971)), or "arbitrarily ignore[d] or perfunctorily process[ed] a grievance," *Miller v. Gateway Transportation Co.,* 616 F.2d 272, 277 n. 11 (7th Cir.1980) (*citing Hines v. Anchor Motor Freight,* 424 U.S. 554, 563, 569, 96 S.Ct. 1048, 1055, 1058, 47 L.Ed.2d 231 (1976)). This circuit has placed less emphasis on the "magic words" of *Vaca* and its brothers and sisters, and more on the "framework of facts" presented by the case before it. *Ryan v. New York Newspaper Printing Pressman's Union No. 2,* 590 F.2d 451, 456 n. 12 (2d Cir.1979). In the case before us, Local 457 fulfilled its duty when Mr. Friedberg (1) protested the firings, Reply Affidavit of

Robert W. Corcoran (October 22, 1982), ¶ 26; (2) immediately thereafter contacted Local 457's lawyer, Murray Goldberg, explaining that plaintiffs had been terminated for failure to obtain licenses; and (3) was told that the union had no basis for objecting to the Raceway's action. Affidavit of Robert J. Friedberg (September 17, 1982), ¶¶ 5, 6; Woods Affidavit, n. 6. Although Mr. Goldberg's inquiry was considerably less elaborate than the one approved of by Judge John R. Bartels in *Karim v. United States Lines, Inc.,* 111 L.R.R.M. at 2498 ("union attorneys conducted an exhaustive investigation into [plaintiff's] discharge"), the issue here (particularly in light of the above discussion) was comparatively simple and narrow.

Plaintiffs assert that the real reason Local 457 did not object more loudly to the terminations was the existence of long-standing animosity between Messrs. Woods and Friedberg, but there is no evidence that this animosity (assuming that it existed, which we don't) in any way colored the quite sensible judgment of the Raceway's attorney. Affidavit of Murray Goldberg (September 17, 1982).