397 F.2d 760
 DARLINGTON MANUFACTURING COMPANY; Deering Milliken & Co.,
Inc., and Deering Milliken, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent. Textile Workers
Union of America, AFL-CIO, Intervenor.
 No. 11554.
 United States Court of Appeals Fourth Circuit.
 Argued Dec. 5, 1967.
Decided May 31, 1968.
 
 Thornton H. Brooks, Greensboro, N.C., (McLendon, Brim, Brooks, Pierce & Daniels, Greensboro, N.C., on the brief) for Darlington Manufacturing Co.
 John R. Schoemer, Jr., and Stuart N. Updike, New York City, (John D. Canoni, Bronxville, N.Y., on the brief) for Deering, Milliken, Inc., and Deering, Milliken and Co., Inc.
 Frank H. Itkin, Atty., N.L.R.B., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., N.L.R.B., on the brief) for respondent.
 Daniel B. Jordan, Gen. Counsel, Textile Workers Union of America, AFL-CIO, for intervenor.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges, sitting en banc.
 BUTZNER, Circuit Judge.
 
 
 1
 Soon after the Textile Workers Union won an election at Darlington Manufacturing Co., stockholders liquidated and dissolved the corporation. In Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), the Court held that an employer does not engage in an unfair labor practice when he permanently closes his entire business, even if the liquidation is motivated by vindictiveness toward a union. A partial closing, however, 'is an unfair labor practice under 8(a)(3)[1] if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect.'[2] The Court remanded the case to allow the National Labor Relations Board to make findings on the purpose and effect of the closing and to afford this court an opportunity to review the Board's single employer finding and the remedy it proposed.[3]
 
 
 2
 Upon remand, the Board, disagreeing with the trial examiner,[4] found the persons controlling Darlington had sufficient interest and relationship with Deering Milliken, Inc., and other affiliated corporations, to establish a single enterprise; and that Darlington's closing was accomplished under circumstances that established the factors of 'purpose' and 'effect' with respect to chilling unionism in other mills of the Deering Milliken group. Consequently, the Board concluded that the closing of Darlington's mill was the partial closing of a business in violation of 8(a)(3). The Board ordered Darlington and Deering Milliken to pay back wages until the employees obtained substantially equivalent employment or were put on a preferential hiring list by Deering Milliken.
 
 
 3
 The case is before us on the joint petition of Darlington and Deering Milliken to review and set aside the Board's order and on the cross-application of the Board for enforcement. We hold the Board correctly applied the precepts governing remand and that the Board's findings are supported by substantial evidence on the record as a whole. Accordingly, we enforce the Board's order.
 
 I.
 
 4
 When this case was last before us, we did not review the Board's finding that Darlington and Deering Milliken, affiliated corporations, were a single employer, because we concluded that an employer had an absolute prerogative to terminate its business permanently in whole or in part.[5] Now, however, the single employer issue is crucial, for if Darlington were independent, the liquidation of its business would not be an unfair labor practice. The same conclusion does not necessarily follow, however, if 'Darlington is regarded as an integral part of the Deering Milliken enterprise.'[6]
 
 
 5
 Mr. Justice Harlan, writing for the Court, stated the criteria that determine the employer's status, and the elements that must be established to show an unfair labor practice:[7]
 
 
 6
 'While we have spoken in terms of a 'partial closing' in the context of the Board's finding that Darlington was part of a larger single enterprise controlled by the Milliken family, we do not mean to suggest that an organizational integration of plants or corporations is a necessary prerequisite to the establishment of such a violation of 8(a)(3). If the persons exercising control over a plant that is being closed for anti-union reasons (1) have an interest in another business, whether or not affiliated with or engaged in the same line of commercial activity as the closed plant, of sufficient substantiality to give promise of their reaping a benefit from the discouragement of unionization in that business; (2) act to close their plant with the purpose of producing such a result; and (3) occupy a relationship to the other business which makes it realistically foreseeable that its employees will fear that such business will also be closed down if they persist in organizational activities, we think that an unfair labor practice has been made out.
 
 
 7
 'Although the Board's single employer finding necessarily embraced findings as to Roger Milliken and the Milliken family which, if sustained by the Court of Appeals, would satisfy the elements of 'interest' and 'relationship' with respect to other parts of the Deering Milliken enterprise, that and the other Board findings fall short of establishing the factors of 'purpose' and 'effect' which are vital requisites of the general principles that govern a case of this kind.'
 
 
 8
 The facts leading to the Board's finding of a single employer previously have been published.[8] Repetition of all the details is unnecessary. Darlington was chartered by South Carolina in 1883. It operated a mill in Darlington, South Carolina, for the manufacture and sale of cotton greige goods. It had no other plant or office. In 1937, Deering Milliken & Co., a New York corporation,[9] acquired 41% Of Darlington's stock through a bankruptcy proceeding. The majority stockholders of Deering Milliken & Co. were members of the Milliken family. In 1956, when Darlington was closed, members of the Milliken family, through their majority ownership of Deering Milliken and Cotwool Manufacturing Corp., and their individual Darlington holdings, controlled about 66% Of Darlington's stock.
 
 
 9
 The Milliken family controlled 17 corporations operating 27 textile mills, of which 20, including Darlington, were in South Carolina. Directors of Deering Milliken constituted a majority of the boards of directors of the mill corporations except one. Deering Milliken was the exclusive sales agent and factor of all 27 mills. It had no non-Milliken clients. The head of Deering Milliken's tax department was an officer of each corporation. Deering Milliken's insurance department handled insurance for the mills. A single workmen's compensation policy and a single fire policy covered all mills. One attorney advised all mills on labor relations. Products of the mills were sold under the name, 'Milliken.' Two wholly owned subsidiaries, Deering Milliken Service Corporation, and The Deering Milliken Research Corporation, conducted surveys, inspections, research, and studies for the benefit of all mills. They developed a standard cost system and a uniform preventive maintenance program, and set production goals. The subsidiaries purchased machinery, equipment and cotton, and recruited supervisory and technical trainees for the mills. The day to day manufacturing operations were conducted by the mill treasurers, who were the chief executive officers at each mill. They were granted considerable authority in hiring, firing, wage rates and pricing. They recognized, however, that they were a part of the Deering Milliken group.[10] After Darlington was closed, arrangements were made to carry Darlington supervisory personnel on the payroll of the Deering Milliken Industrial Engineering Department for a three-month period, within which they could be picked up by other Deering Milliken mills. A number of the supervisors were transferred to positions in the Deering Milliken organization.
 
 
 10
 Roger Milliken was president of Deering Milliken and all the mill corporations except one, for which he served as vice president and member of the board. He was president of Darlington at the time it closed. He kept himself well-informed and frequently advised the mill treasurers on nearly every phase of the mills' operations. No one expressed better than Milliken that he was the head of a well-integrated single enterprise. He wrote of the necessity of 'goals for each of the mills in the organization' as a proper subject for discussion at the next meeting of the mill treasurers. He planned to hold quarterly meetings 'of all our mills at which each one of them will make a presentation to the group of what they have accomplished * * *.' He went on to say, 'So may of the policies of the whole company are developed at meetings like this that I think it would be extremely valuable if you could plan to be present and thus know of all the things that are being done to make the manufacturing of Deering Milliken as outstanding as possible.'
 
 
 11
 Darlington and Deering Milliken have argued that lack of common control of labor policy and absence of substantial identity of ownership negate the Board's single employer finding. The record viewed as a whole supports the Board's finding that Milliken exercised ultimate control over the labor relations of all the corporations. Milliken did not limit his participation in a uniform labor policy to a mere statement of views. For example, when he felt it necessary to clarify a uniform policy on payroll deductions, he issued a directive calling upon his miss officers to observe the gorup's policy. One attorney, J. D. Poag, represented and advised all mills on labor relations. His employment was not the result of coincidental action taken by independent mill treasurers. Poag enjoyed Milliken's confidence and had authority to speak for him. In opposing union organization at Darlington, Poag reflected Milliken's policy for all mills, not just Darlington. Finally, it was Milliken, not the treasurer of Darlington, who initiated and pressed the closing of the mill after the union's victory.
 
 
 12
 The fact that approximately 33% Of Darlington's stock was owned by persons who were not members of the Milliken family does not of necessity lead to the conclusion that Darlington and the Deering Milliken affiliated corporations cannot be considered a single employer for the purpose of determining whether 8(a)(3) was violated. Neither the Board nor the courts have applied a simple mechanistic test of stock ownership to determine single employer status. Identity of ownership may be an indicium of this status, e.g., NLRB v. Calcasieu Paper Co., 203 F.2d 12 (5th Cir. 1953), but it is not indispensable NLRB v. Gibraltar Industries, Inc., 307 F.2d 428 (4th Cir. 1962), cert. denied, 372 U.S. 911, 83 S.Ct. 724, 9 L.Ed.2d 719 (1963). The Milliken family controlled sufficient stock in the several corporations of the Deering Milliken group to effectively shape the corporate structure of the enterprise. As Judge Bell pointed out in his dissent, the evidence 'indicates that the separate corporate entities of the Deering Milliken complex were largely paper corporations that could be shifted and changed at the convenience of the Milliken family.'[11] Moreover, the Court in Darlington expressly stated tht an organizational integration of plants or corporations is not a necessary prerequisite to establish a violation of the Act.[12]
 
 
 13
 We hold that the evidence considered as a whole supports the Board's single employer finding, which in turn satisfies the elements of 'interest' and 'relationship', which the Supreme Court required as a predicate to proof of a 8(a)(3) violation.[13]
 
 II.
 
 14
 The Board found that Darlington's closing was motivated by a purpose to discourage unionism in the remaining Milliken mills. With respect to this element the Court pointed out:[14]
 
 
 15
 'It does not suffice to establish the unfair labor practice charged here to argue that the Darlington closing necessarily had an adverse impact upon unionization in such other plants. We have heretofore observed that employer action which has a foreseeable consequence of discouraging concerted activities generally does not amount to a violation of 8(a)(3) in the absence of a showing of motivation which is aimed at achieving the prohibited effect.'
 
 
 16
 In March 1956 the union began a campaign at Darlington. The Mill treasurer promptly informed Milliken, who in turn asked J. D. Poag to go to Darlington and advise the mill treasurer during the campaign. Management waged a vigorous campaign against the union. Included in its tactics were supervisors' threats that the plant would close if the union won.[15] The union won the election on September 6, 1956. The supervisors' predictions were immediately realized. The day after the election Milliken decided he would recommend to Darlington's directors and stockholders that they close the plant. At a special meeting on September 12 that lasted about 75 minutes, the directors resolved to liquidate Darlington and called a special meeting of stockholders to approve the proposal.[16] The stockholders met on October 17. Milliken opened the meeting with the statement that when the employees voted for a union he decided to close the mill. A majority of the stockholders approved the resolution to liquidate. After the meeting a person opposed to closing pointed out to Milliken that 83% Of the employees had signed a petition to go back to work whether or not they had a union. Milliken responded, 'As long as there are 17% Of these hardcore labor people here I refuse to run the mill.'
 
 
 17
 The mill was closed in November and its assets were sold piecemeal at public auction December 12 and 13. The employees were discharged.
 
 
 18
 Anti-union animus alone does not establish the petitioners' violation of 8(a) (3). Moreover, it is insufficient to show only the impact of the closing on Darlington employees. The Supreme Court required a showing of motivation to chill unionism in remaining plants of the Deering Milliken enterprise. The Board's finding that this motive was present is supported by the record as a whole.
 
 
 19
 The use of prior closings to chill unionism was not unknown in the Deering Milliken group. During the Darlington election campaign the history of Deering Milliken's closed plants was exploited to raise the spectre of Darlington's closing. Poag told the supervisors that Milliken had not said what he would do as far as Darlington was concerned. He added, however, that other mills had closed down where Milliken 'had tried to operate with the union.'[17] The supervisors understood the message. The record discloses numerous instances in which they told employees that Milliken had closed other mills because of unionization and that he would do the same at Darlington.
 
 
 20
 The chilling effect of plant colsing was part and parcel of Darlington's antiunion campaign. Significantly this tactic did not end with Darlington's election. On November 14, 1956, after the decision to close Darlington, Milliken sent a memorandum to thirty-six mill treasurers and other officials of Deering Milliken affiliated corporations that stated:
 
 
 21
 'Attached hereto is an article from the November eighth issue of America's Textile Reporter. I am sending it to you in case you have not had an opportunity to see it. It is apparent from this article that this magazine made a real investigation in Darlington, and for that reason, I think the article is interesting.
 
 
 22
 'While this article shows that the union leader definitely misled the people, it also points out that the mill was negligent in its public relations. I hope that you will read this second part of the article carefully and review in your mind the steps that you are taking to bring about an understanding of your mill and its problems in your community. The unions are going to be making a tremendous drive all through this area, and there are few things that are more important to us than making sure that the leaders in your community understand and are sympathetic to what you are trying to do.'
 
 
 23
 The article Miliken commended was headlined, 'Darlington Situation Becomes Object Lesson to All Concerned.' The article spoke of the 'workers' unfortunate choice' and reported that business in the town of Darlington was depressed because the mill had closed. It stressed the need and value of good public relations as a lesson to be learned from the Darlington affair. Milliken also enclosed an editorial from America's Textile Reporter of the same date as the article, which said in part:
 
 
 24
 'If the people of Darlington knew anything of the Deering Milliken record they would know that management does not intend an unprofitable division nor has it intended to share the prerogatives of management with labor union leaders. This has been the case through three generations of Milliken operations. When the Madison Woolen Mills of Madison, Maine, became not only unprofitable but unionized, Mr. Gerrish Milliken liquidated it, although the Cowan and Farnsworth Mills in the State of Maine still operate and must, therefore, be profitable. When the Dallas Manufacturing Company of Huntsville, Alabama, became unionized, the Millikens liquidated it, contrary to the opinion of many local people that such would not be the case. We ourselves are small shareholders in Darlington and from experience and acquaintanceship, we knew the minute the union election vote was announced that we would receive a call for a special meeting to vote for liquidation.'
 
 
 25
 Milliken also enclosed a news clipping that reported the permanent closing of a unionized mill in Massachusetts.
 
 
 26
 The Board found that the memorandum and its attachments were important on two counts. First, they demonstrated Milliken's opinion that the unions were in the process of mounting a drive through the area, and second, the results of a failure of public relations were made clear. Milliken drove home to the mill managers the tradition of three generations of Millikens who closed unionized mills in Maine, Alabama, and Darlington. Milliken's memorandum, however, was not limited to the dissemination of his views. It contained a directive to review the steps being taken to bring about an understanding in the community of the Deering Milliken mills and their problems. It stressed the importance of the mill treasurers' 'making sure that the leaders in your community understand and are sympathetic to what they are trying to do.' The Board commented, 'The only way that community leaders could make use of this information would be by impressing upon employees the risks of unionism; an emphatic and timely example of those risks was Darlington.'[18]
 
 
 27
 Deering Milliken urges that the Board's reliance upon Milliken's memorandum and two of his speeches was impermissible under 8(c) of the Act.[19]
 
 
 28
 The memorandum was admissible. It was not merely the expression of Milliken's views, argument or opinion, which alone are privileged under 8(c). The memorandum was a directive to the mill treasurers and other officials to review their public relations in the light of the enclosures. The enclosures emphasized that union representation leads to the closure of Deering Milliken mills.
 
 
 29
 Milliken's memorandum falls within the exclusions from 8(c) about which Senator Taft wrote in his Memorandum of Legislative Intent dated June 5, 1947:[20]
 
 
 30
 'It should be noted that this subsection is limited to 'views, arguments or opinions' and does not cover instructions, directions, or other statements which might be deemed admissions under ordinary rules of evidence. In other words, this section does not make incompetent, evidence which would ordinarily be deemed relevant and admissible in courts of law.'
 
 
 31
 The distinction Senator Taft drew is emphasized by his further remarks:[21]
 
 
 32
 'It has been argued, however, that the prohibition against using expressions of opinion as evidence goes must further than the rules with respect to admissibility in a criminal or civil trial. Senators making this argument overlook the fact that the privilege of this subsection is limited to expression of 'views, arguments, or opinion.' It has no application to statements which are acts in themselves or contain directions or instructions.'
 
 
 33
 We conclude that Milliken's memorandum of directions and instructions, and its illustrative enclosures, written after the decision to close the plant had been taken, were not simply an expression of his views, arguments or opinions. Section 8(c) did not render the memorandum and its attachments inadmissible.[22]
 
 
 34
 The Milliken speeches stand on a different footing. Both speeches, delivered to businessmen and state officials months before the Darlington election, disclosed Milliken's belief that the textile industry in South Carolina should remain non-unionized. The Board carefully limited its consideration of these speeches, saying:[23]
 
 
 35
 'Whatever limitations Section 8(c) might impose in other circumstances upon the use of employer expressions of antiunion sentiment, the purpose for which we here consider these speeches does not violate that provision. In this case, we look to Milliken's speeches not simply as proof that he closed Darlington because of the Union (a settled matter, we believe), but as evidence of both his apprehension of an anticipated large-scale union campaign and of his belief that an industry-wide response was imperative. These two speeches clarify the scope and breadth of the antiunion considerations which led to the Darlington closing, and we think that Section 8(c) was not intended to interdict evidence offered for this purpose.'
 
 
 36
 We believe that 8(c) did not prohibit the Board from considering the speeches for the limited purposes mentioned in its decision. The use of protected statements 'to draw the background of the controversy and place other nonverbal acts in proper perspective' has been sanctioned.[24]
 
 
 37
 Even if 8(c) is considered to bar the speeches, their admission does not require that enforcement of the Board's order be denied. The speeches revealed nothing of substance not shown by other evidence. The speeches neither add to, nor detract from, the evidence necessary to support the Board's decision.
 
 
 38
 Deering Milliken also argues that the six-months' limitation found in 10(b) ( 29 U.S.C. 160(c)) proscribes the Board's use of the speeches. Neither speech, however, was an unfair labor practice. The unfair labor practices found by the Board were well within the six-months' limitation period. The speeches were utilized only to clarify and shed light on events which occurred within the limitations period. This use is not prohibited by 10(b). See Local Lodge No. 1424, Int'l Ass'n of Machinists v. NLRB, 362 U.S. 411, 416, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (dictum); NLRB v. Craig-Botetourt Elec. Coop., 337 F.2d 374 (4th Cir. 1964).
 
 
 39
 The petitioners, Darlington and Deering Milliken, urge that the mill was closed for economic reasons. They point out that in August 1956, a month before the union election, the mill treasurer reported ported an estimated loss of $40,000 for the current year. It also appeared that a loss of $240,000 could be anticipated for the following year. The petitioners stress that Darlington was an old mill, that it had lost its traditional market, that foreign imports adversely affected its competitive position, that it was faced with low market prices and high production costs, and that a modernization program would be expensive and would meet with employee resistance.
 
 
 40
 After reviewing testimony supporting these allegations, we conclude that it did not require the Board to find Darlington was closed because of economic factors. During the first nine months of 1956 a capital improvement program involved expenditures in the amount of $400,000. In September 1956 construction changes were being undertaken to accommodate newly purchased looms. The mill continued to operate and the capital improvement program was uninterrupted until after the employees voted to join the union. Milliken did not call a special meeting of the board of directors to close the company or halt the capital improvement program when he learned of the prospective $40,000 loss. Despite the economic problems the petitioners stress, three directors were not told before the meeting in September 1956 that a plant closing was under consideration. From these and other facts mentioned elsewhere in this opinion, we find adequate support for the Board's finding that the decision to close the mill was not based on economic factors, and that it would not have been made but for the protected organizational activities of the employees.
 
 
 41
 Darlington points out that all the directors testified to the effect that the plant was not closed to chill unionism.[25] It suggests that the Board concentrated exclusively on Milliken's motive and that 'to assume that six of Darlington's seven directors voted for liquidation merely because Roger Milliken proposed it is to assume, without support in the record, that they unlawfully ignored their fiduciary duties.' We do not find this argument persuasive. The record shows that Milliken interests controlled Darlington and that Roger Milliken occupied a dominant role in the management and control of these interests. The Board did not have to shut its eyes to the fact that corporate directors are frequently responsive to interests that control the majority of a corporation's stock. This response does not necessarily demonstrate breach of the directors' fiduciary duties. Furthermore, it was the stockholders who ultimately liquidated the corporation. The Milliken interests held control of the corporation and voted a majority of the stock for liquidation. Some non-Milliken stock, unnecessary to produce a majority, was also voted for a liquidation. Other minority stockholders who had no interest in the remaining Deering Milliken mills voted against liquidation.
 
 
 42
 The Board found 'the closing of Darlington was, at least in part, the product of a desire to discourage unionism among employees at other Deering Milliken Mills.'[26] Deering Milliken argues that the Board's decision is fatally defective because it fails to find that a chilling purpose was the predominant, or at least substantial and determining, cause of the Darlington closing. Deering Milliken asserts, 'The theme that ran throughout (the Board's) 1962 decision was that the dominant motive behind the closing was the punishment of Darlington's employees ployees for exercising their 7 rights. * * * (The Board) cannot consistently now say that but for a purpose to chill elsewhere, Darlington would not have closed.'
 
 
 43
 We do not find the Board's position in 1962 to be mutually exclusive of the position that it took in 1967. In 1962 the Board viewed Darlington's reprisal against its own employees as prohibited discrimination. Consequently, there was no occasion for the Board to consider whether the Deering Milliken interests pursued the compatible objective of thwarting unionization at other plants. Nevertheless, the record, as it existed in 1962, was not wholly devoid of evidence that showed the chilling purpose of Darlington's closing. When this case was previously before the court, two dissenting judges pointed out:[27]
 
 
 44
 'The Darlington mill was but a small unit in a vast industrial empire employing more than 19,000 persons owned ans controlled directly or indirectly by the Milliken family. Its closure was intended to be and was a grim deterrent to thousands of employees in the affiliated plants who might entertain similar notions of unionization.'
 
 
 45
 We conclude it was sufficient for the Board to find that the election of the union was a substantial cause of Darlington's closing and that the employer was actually motivated, at least in part, by a purpose to chill unionism in other Deering Milliken Mills. The coexistence of this chilling purpose with an antiunion purpose directed against Darlington employees does not impair the Board's decision.[28]
 
 III.
 
 46
 Finally, the Board found 'that the relationship of the persons closing Darlington to the other businesses was such as to make it realistically foreseeable that employees of the latter would fear that their mills also would be closed if they engaged in organizational activity; that the persons exercising control over Darlington did, in fact, foresee and intend this effect, and that a number of these employees were, in all likelihood, so affected.'[29]
 
 
 47
 Deering Milliken contends that a violation of the Act must be predicated upon a finding that an organizing campaign was actually under way in the employer's remaining businesses at the time of the closing. It buttresses this argument by quoting from the Supreme Court's opinion, '(It must be) realistically foreseeable that its employees will fear that such business will also be closed down if they persist in organizational activities * * *.'[30] Deering Milliken argues, 'Actions which are being persisted in are actually occurring, not foreseeable,' and there is a 'difference between the realization of an immediate benefit (cooling off a current union campaign) and a future one (discouraging the union from starting a hypothetical campaign at some future and unknown date).'
 
 
 48
 Along with the Board, we do not read such a fine distinction in the word persist. Motor Repair, Inc., 168 N.L.R.B. No. 148, 67 LRRM 1051 (1967), illustrates the Board's rule. There the employer closed its Birmingham repair shop (one of six it operated) and discharged its employees there 'to penalize them for having selected the union as their bargaining agent.' The trial examiner found this conduct violated 8(a)(3). The Board found that the closing was not an unfair labor practice, saying:
 
 
 49
 'Having reviewed the record in the light of the foregoing tests (Textile Workers (Union of America) v. Darlington (Mfg. Co.), 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)), we conclude that the evidence does not preponderate in favor of a finding that, in closing the Birmingham shop, Respondent was motivated by a desire to chill unionism at its other shops. Thus, there is no evidence that contemporaneous union activity existed at other shops, or that the union's organization of the Birgingham shop was a first step, or was believed by Respondent to be a first step, of an effort to organize all of the shops.'
 
 
 50
 We hold that contemporaneous organizational activity in the other plants is not a prerequisite to finding an unfair labor practice. It is sufficient if the employer anticipated such activity in the reasonably near future. Proof of this is supplied by Milliken's memorandum of November 14, 1956, 'The unions are going to be making a tremendous drive all through this area * *.'
 
 
 51
 There can be no doubt that the persons controlling Darlington could realistically foresee that news of its closing soon after the election would be communicated to many other Deering Milliken employees. Even before the stockholders' meeting, the directors' recommendation was reported extensively throughout South Carolina, where Deering Milliken had nineteen other affiliated mills, one of which was only fourteen miles from Darlington. Predictably, news of the stockholders' meeting and the auction of the plant equipment was widely published. The testimony of employees at other Deering Milliken mills justifies the Board's finding that 'conversations about Darlington between employees, and between employees and supervisors, were commonplace at other mills, and this might well be expected.'[31] Discussion of Darlington included the prophecy that other mills would be closed if they were organized.
 
 
 52
 In reaching its decision, the Board concluded it was unnecessary to show the subjective effect of the Darlington closing on other Deering Milliken employees. Instead the Board reasoned that it should apply the usual standard of whether the closing had a natural tendency to discourage union adherents in other plants.
 
 
 53
 The petitioners contend that the Board (but not the trial examiner) misread its instructions from the Supreme Court and that an actual chilling effect was required to be shown. Pointing to the 30,000 mill employees, Deering Milliken asserts, 'The fatal defect in the Board's finding as to 'effect' is that not one witness was found to testify that he was discouraged by the Carlington closing from persisting in, or even initiating, any organizational activities in his own mill.'
 
 
 54
 We believe the standard the Board adopted is proper. The Supreme Court did not remand to determine the subjective effect of the closing on employees at other Deering Milliken mills. Instead, it spoke in terms of an effect that was realistically or reasonably foreseeable. The Board carefully distinguished between the employer's subjective motive, interest or purpose to chill unionism elsewhere-- Which has been shown[32] -- and the subjective effect on employees in remaining mills-- which need not be shown. To adopt the view expressed by Deering Milliken would require a subjective probing of employees, previously deemed unnecessary.[33]
 
 IV.
 
 55
 To remedy the violation the Board directed Deering Milliken to offer to rehire the Darlington employees at other mills, to pay their transportation expenses, or if work were not available, to put them on a preferential list for hiring. The Board also ordered Darlington and Deering Milliken to make whole the employees for any loss of pay until they obtained substantially equivalent employment or were placed on Deering Milliken's preferential hiring list.[34] The Supreme Court did not pass upon the Board's order. It did, however, suggest 'a possible remedy open to the Board in such a case, like the remedies available in the 'runaway shop' and 'temporary closing' cases, is to order reinstatement of the discharged employees in the other parts of the business.'[35]
 
 
 56
 We find the remedy is appropriate. Requiring reinstatement and back pay is not an innovation. Substantially similar remedies, albeit involving fewer employees, were ordered in NLRB v. Missouri Transit Co., 250 F.2d 261 (8th Cir. 1957) (partial closing of a business); NLRB v. Preston Feed Corp., 309 F.2d 346 (4th Cir. 1962) (runaway shop); and NLRB v. Wallick, 198 F.2d 477 (3rd Cir. 1952) (runaway shop).
 
 
 57
 The Board deemed the back pay award essential to rectify the violation of 8(a) (3). It did not, however, order the back pay to run until reinstatement occurred, which is the customary remedy for discriminatory discharges. instead the Board ordered back pay only until the discharged employees were able to obtain substantially equivalent employment, and it allowed the petitioners to terminate back pay liability by placing the discharged employees on a preferential hiring list at other Deering Milliken mills. The Board also recognized that the petitioners might have a superseding, lawful reason for terminating or reducing back pay liability, such as showing that as of a particular date Darlington would have closed its mill or laid off employees even if they had not voted for the union. Provision is made in the Board's order for an opportunity to show mitigating circumstances at the compliance stage of the proceeding.
 
 
 58
 Deering Milliken urges that the back pay award should be tolled because the examiner recommended dismissal of the complaint, and it was entitled to rely upon that decision until the Board reversed. For many years the Board followed the policy of tolling a back pay award when the trial examiner found in favor of the employer. The Board established its present practice of generally refusing to toll back pay in APW Products, Inc., 137 NLRB 25, 50 LRRM 1042 (1962), enforced National Labor Relations Board v. A.P.W. Products Co., 316 F.2d 899 (2d Cir. 1963). Its policy was restated and clarified in Farrell Hicks Chevrolet, Inc., 160 NLRB 134, 63 LRRM 1177 (1966). There the Board explained that an employer generally has no equitable standing for tolling an award when the unfair labor practice is based on a 8(a)(3) complaint. In these cases the discharge usually is prompted by an unlawful intent to discourage union activity, and the policy of the Act dictates that the resulting financial burdens should be placed upon the violator of the Act and not the employee against whom the discrimination has been directed. Only when the employer was not motivated by an unlawful intent does the Board now consider tolling. The Board's application of its rule to this case is not arbitrary or capricious, and we find no compelling reason for requiring it to revert to tolling practices discontinued many years ago.
 
 
 59
 Deering Milliken also urges that the Supreme Court's tests of 'interest' and 'relationship' appear somewhat less exacting than the traditional single employer test and relate only to the standards for determining whether Darlington has violated the Act. These tests, Deering Milliken contends, are insufficient to impose vicarious remedial liability on Deering Milliken or on other corporations in its group. We do not agree. We find nothing in the Supreme Court's opinion to suggest that the single employer test should be more rigorous with respect to remedy than it is with regard to violation. The Court does not suggest the Act confers on employees a right without a remedy.
 
 
 60
 It is the Board which is charged with fashioning a remedy to effectuate the policies of the Act. 'Within this limit the Board has wide discretion in ordering affirmative action * * *. The particular means by which the effects of unfair labor practices are to be expunged are matters 'for the Board not the courts to determine.' * * * (The Board's order) should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate & P. Co. v. NLRB, 319 U.S. 533, 539, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).
 
 V.
 
 61
 The Board also found that Darlington threatened the employees that the mill would be closed if the union won the election; told the employees after the election that the mill had been closed for this reason; supported a petition to disavow the union; and interrogated the employees with respect to their activities in behalf of the union. This conduct was held to violate 8(a)(1) of the Act. These findings need no extended discussion. They are amply supported in the record. The Board also found a violation of 8(a)(5) because Darlington refused to bargain; that the discharge of the employees constituted a ciolation of 8(a)(1); and that Darlington violated 8(a)(5) by refusing to bargain with respect to the tenure of employment of the Darlington employees and by refusing to furnish the Board with wage and related information. The validity of these findings is based upon the finding that the closing of the mill violated 8(a) (3) and requires no further discussion.[36]
 
 
 62
 Enforcement granted.
 
 HAYNSWORTH, Chief Judge (concurring):
 
 63
 I generally join the judgment of the court, but not without some misgivings springing principally from the conduct of the independent stockholders and directors.
 
 
 64
 I have no doubt that any executive in the position of Roger Milliken would not have approached the closure of Darlington, whether or not a union was in the picture, without careful thought to the effect of the closure upon employees of other mills under his general management. Anything less would have been managerial imprudence. In light of the proof of his purpose to avoid unionization elsewhere, therefore, I can readily accept the finding that he expected Darlington's closure so soon after the election to serve the purpose of a dramatic warning to employees of other mills.
 
 
 65
 The difficulty in accepting the Board's other findings, for me, stems principally from the concurrence of Darlington's independent directors and stockholders, for they had no discernible interest in labor relations at other mills. Two of the directors were truly independent. One of them was a former treasurer of Darlington, but he was then retired and resident in the town of Darlington, while the other was a Darlington Businessman without even a former history of employment by any Deering-Milliken related enterprise. Those directors, as directors, and they and other independent stockholders representing a third of the outstanding stock, were totally unconcerned with Milliken's present or prospective managerial problems in other mills. Their only interest was that of Darlington's stockholders, qua stockholders, except that those two directors and other stockholders resident in Darlington may have been influenced against the clousre by its adverse impact upon other businesses in that small town. Their interest, therefore, indisputably was to oppose closure of the plant unless closure was dictated by the economic hopelessness of continued operation.
 
 
 66
 While Roger Milliken was the dominant individual in the management of all of the corporations, he had no power of control over the independent stockholders and directors on the question of plant closure. He could not ask them to sacrifice their financial interest for the sake of some anticipated advantage to Milliken elsewhere. Nor were they in a position of helplessness. If a purpose to chill unionization elsewhere was the procuring cause of the votes of the majority of the directors and of the Milliken stockholders, they committed a gross breach of their fiduciary duty to the minority stockholders, for which the courts provide injunctive and compensatory remedies. Armed with the weapons the minority had, there was no occasion for supine acquiescence; they had every incentive to fight for their own financial interest, and, if pointed toward continued operation of the mill, for the financial interests of their fellow townsmen.
 
 
 67
 If the independent, minority directors and stockholders, except those few dissenting stockholders, were convinced that subsequent operation of the mill was not in their economic interest, as they clearly were, it is difficult to ascribe a different controlling purpose to the majority. Closure of antiquated textile mills is far from unknown in the South as in the East, and everything in this record points to the conclusion that Darlington's days were numbered. The capital improvement program does not militate against the conclusion, for the capital expenditures were concentrated in movable machinery, not in brick and mortar or in such equipment as air conditioning, in which installation charges constitute a large proportion of the cost, and cost recovery is dependent upon subsequent successful operation. The expenditures were entirely consistent with last efforts to retrieve a dying venture and contain no suggestion of a willingness to reconstruct the building to one of modern efficiency or to incur all of those other costs which would have been necessary to convert the plant to other fabrics which might have been sold profitably. In short, on this score, the only open question on the record appears to have been not whether Darlington might have survived, but when its demise would have occurred.
 
 
 68
 On the question of timing, however, it seems to me there is a basis in the record for the Board's findings. No one contends that the relation in time between the election and the decision to suspend operations was fortuitous or coincidence. It may be, as Darlington contends, that the election result simply made a bleak prospect more dismal, but the record is not devoid of support for the inference that Roger Milliken was substantially motivated to move when he did with a purpose to salvage what advantage he could from a dramatic example to the employees of other plants. It is clear that the independent directors would have made no such move at that time, for the subject of plant closure had not been discussed, and there is no showing that they had been shown the projections of the next year's losses. To the extent, therefore, that Roger Milliken was influenced by his interest in labor relations at other Milliken controlled mills and that his actions may be said to have been prompted by mixed motives, consistent with each other, the inference that his concern about other plants was not insubstantial is not so tenuous as to warrant our rejection. There is room for a difference of opinion as to whether, without a thoght of the other plants, he would have moved when he did or waited for the next regularly scheduled directors' meeting. A leisurely approach to the avoidance of projected heavy losses is not to be expected but there is room in this record for the inference, drawn by the Board, that his action was more precipitate than it would have been had he been unconcerned about the employees of other plants.
 
 
 69
 The choice between permissible inferences, of course, is for the Board, not the Court, and, to the extent I have indicated, I think the inference the Board drew was a permissible one.
 
 
 70
 As the principle opinion notices, the duration of any back pay period has been left for determination in compliance proceedings, and there is no occasion for us to address ourselves to that matter, except that I would note that one cannot reconcile the emphatic evidence of the conduct of the independent directors and stockholders with any notion that Darlington had more than a very brief expectancy.
 
 
 71
 Finally, I would relieve Darlington of its joint obligation to discharge any back pay awards. It has liquid assets available for distribution to its stockholders subject to the payment of such awards. Equitably, a third of the fund belongs to the independent stockholders, who have committed no unfair labor practice. If an unfair labor practice was committed, as the Board found, it was committed by Roger Milliken and his associates for the supposed benefit and advantage of other Milliken enterprises, not in the least for the advantage of Darlington's stockholders. I think Deering-Milliken should alone shoulder the burden of payment of any back pay award.
 
 ALBERT V. BRYAN, Circuit Judge (dissenting):
 
 72
 The Supreme Court's prefatory recount of the facts, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1964), necessarily taken from the Board's findings, discloses a complete knowledge of all of the conduct and tie-ins which is now the predicate of the majority opinion. These premises the Supreme Court declared fell 'short of establishing the factors of 'purpose' and 'effect' which are vital requisites of the general principles that govern a case of this kind.' The controversy was remanded to the Board to make further findings.
 
 
 73
 Nothing significantly new was introduced after the remand. This is the observation of the trial examiner who heard the evidence on the return of the case to the Board. Indeed, this is manifest too in the majority's reliance now on what was said in dissent here, of course before the appeal. 325 F.2d 682, 689 (1963). My difficulty is understanding how our Court sees the facts as supporting 'purpose and effect' where the Supreme Court could not.
 
 
 74
 A single director's, Roger Milliken, statements, writings and attitude are now imputed to the entire board of directors, and a majority of the stockholders, of Darlington by the Court to sustain the NLRB's finding that both the purpose and foreseeable effect of the plant closure was to 'chill unionism' in the other Milliken plants. All of the power of Roger Milliken, and the entire linkage of Darlington with the other Milliken corporations, upon which the Court now counts, were known to the Supreme Court when it decided this case, and yet it did not think this evidence sufficient to arrive at the judgment now delivered by our majority.
 
 
 75
 The answer is that for its support the majority draws inferences and makes assumptions which are not warranted by the proof. With nothing to sustain it, the majority terms some of the Milliken units as 'paper corporations'. Also, it adopts a sweeping implication that their directors would do just exactly what Roger Milliken wished, for fear they be at once removed and replaced by him to register his views. This undeserved derogation of the directors stands refuted both by the absence of evidence to establish it, and by obstanate facts and testimony exactly opposite.
 
 
 76
 Darlington was closed for economic reasons according to its directors. At least they said so and gave the basis of their determination. The NLRB recognized this fact. In its supplemental decision it admitted that,
 
 
 77
 'according to the testimony in this case, the financial condition of Darlington was discussed at the board meeting. It was brought out that Darlington had averaged less than a 3 percent return on invested capital in the previous 5 years, including the current year in which a loss of $40,000 was expected, and that, if market prices did not rise or costs decrease, a loss of $240,000 could be anticipated in the following year.'
 
 
 78
 There was no impeachment of the Darlington board's word save NLRB's argument, now accepted by the majority, that the members' votes were nothing more than echoes of Roger Milliken's partisanship. Truth is the directors were persons of conviction and unquestioned character. There were 7 including Roger Milliken, and 3 of them had no interest in any other Deering-Milliken corporations. The remaining 3 were connections of the Milliken family. The relationship alone does not impugn their evidence on the economic advisability of the plant closing.
 
 
 79
 The stockholders must also be found unworthy of belief, for they voted to ratify the directors' action. Additionally, the directors of Cotwool and Deering-Milliken must also be condemned in similar fashion. Each board voted, in favor of the closure, all of the Darlington shares held by its corporation, constituting a majority of Darlington's outstanding stock.
 
 
 80
 The NLRB's supplemental decision, upheld by the court, tells Darlington that it did not have a right to liquidate after the union election but instead should have made that decision prior to the election. With the financial losses that Darlington was currently sustaining, the corporation reasoned quite realistically that the foreseeable additional costs resulting from the arrival of the union, would be simply too much for the corporation to bear. Surely this consideration may be indulged, and acted upon, without offense to the National Labor Relations Act-- indeed even if it be a mistaken conclusion.
 
 
 81
 The Trial Examiner emphasized that, 'I find and conclude from all of the testimony * * * at this hearing, confirmed by that previously received, that a purpose at Darlington with respect to employees elsewhere has not been shown; and that testimony concerning related events at other mills is slight, considering quantity and credibility, and that such events can not be causally traced to a chilling purpose at Darlington.'
 
 
 82
 I think it appalling that the Board and the courts may step into a business and tell the directors that their judgment of the economics of their business was not correct, that it did not warrant the closing of their plant and that in reality they were evilly motivated in reference to union organization. More astounding, the Board presumes to know better than do the directors the basis for their decision-- that they were simply paying servile obeisance to another.
 
 
 83
 I would not enforce the Board's order.
 
 
 84
 BOREMAN, Circuit Judge, authorizes me to state that he joins in this dissent.
 
 
 
 [1]
 29 U.S.C. 158(a)(3), which provides in pertinent part: '(a) It shall be an unfair labor practice for an employer--
 '(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *.'
 
 
 [2]
 Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 275, 85 S.Ct. 994, 1002 (1965)
 
 
 [3]
 Charges were filed against Darlington on October 16, 1956. Pertinent reported decisions, culminating in the present petition for review, occurred in the following order:
 Darlington Mfg. Co., 119 NLRB 1069, 41 LRRM 1205 (1957) (remand for further proceedings before trial examiner).
 Darlington Mfg. Co., 139 NLRB 241, 51 LRRM 1278 (1962) (Board's finding of unfair labor practice, and order).
 Darlington Mfg. Co. v. NLRB, 325 F.2d 682 (4th Cir. 1963) (enforcement denied).
 Textile Workers v. Darlington Mfg. Co., 380 U.S. 263 (1965) (remand for further proceedings).
 Darlington Mfg. Co., 165 NLRB No. 100, 65 LRRM 1391 (1967) (Board's supplemental decision. The Board did not modify the order entered in 1962).
 See also Deering Milliken, Inc., v. Johnston, 295 F.2d 856 (4th Cir. 1961), modifying 193 F.Supp. 741 (M.D.N.C. 1961) for a concise statement of the history of this litigation to that date.
 
 
 [4]
 While agreeing that the mill would not have closed 'but for the protected organizational activities' of Darlington's employees, the Board and the trial examiner reached different conclusions on single employer status and chilling purpose and effect. We have considered the trial examiner's findings in our review of the record as a whole, and we conclude that these findings are of insufficient force to destroy the substantiality of evidence upon which the Board's decision rests. Universal Camera Corp. v. NLRB, 340 U.S. 474, 493, 71 S.Ct. 456, 95 L.Ed. 456 (1951)
 
 
 [5]
 Darlington Mfg. Co. v. NLRB, 325 F.2d 682, 685 (4th Cir. 1963)
 
 
 [6]
 Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 274, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)
 
 
 [7]
 Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 275, 85 S.Ct. 994, 1001, 13 L.Ed.2d 827 (1965)
 
 
 [8]
 See Darlington Mfg. Co. v. NLRB, 325 F.2d 682, 687 (4th Cir. 1963) (dissenting opinion); Darlington Mfg. Co., 139 NLRB 241, 51 LRRM 1278 (1962); Darlington Mfg. Co., 165 NLRB No. 100, 65 LRRM 1391 (1967)
 
 
 [9]
 In 1960, Deering Milliken & Co., and Cotwool Manufacturing Corp. merged, forming Deering Milliken, Inc., a Delaware corporation
 
 
 [10]
 For example, the mill treasurer of Darlington, in reporting to the corporation's president, mentioned that pay on a number of jobs 'was well above the average of competitive mills within the Deering Milliken group and information we had received on other mills; that we had known for some time that the pay of our overseers was less then the other D.M. mills,' and that even with the increases that he proposed, the supervisors' salaries would be 'under the mills in the D.M. group.'
 
 
 [11]
 Darlington Mfg. Co. v. NLRB, 325 F.2d 682, 689 (4th Cir. 1963) (dissenting opinion)
 
 
 [12]
 Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 275, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)
 
 
 [13]
 Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 276, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)
 
 
 [14]
 Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 276, 85 S.Ct 994, 1003, 13 L.Ed.2d 827 (1965)
 
 
 [15]
 The trial examiner and the Board found these threats violated 8(a)(1) (29 U.S.C. 158(a)(1))
 
 
 [16]
 Besides Roger Milliken, the board of directors of Darlington included Milliken's brother, uncle, and cousin, all of whom were officers and directors of Deering Milliken in New York. The other Darlington directors were mill treasurer, J. M. Oeland; retired mill treasurer, W. S. Nicholson, and J. H. Lyles, a businessman in the city of Darlington
 
 
 [17]
 J. M. Oeland, Darlington's mill treasurer, testified concerning Poag's address to the supervisors before the election:
 'Q. Did Mr. Poag ever say you can tell the employees what had happened in some of these other plants, but you cannot tell them that the plant closed down on account of the union? A. He made the statement that Mr. Milliken had not said what he would do as far as Darlington was concerned.
 'Q. Right. A. But that there had been other mills that had closed down.
 'Q. He did mention that fact? A. Yes, that other mills had closed down where Mr. Milliken had tried to operate with a union.'
 
 
 [18]
 Darlington Mfg. Co., 165 NLRB No. 100, 65 LRRM 1391, 1398 (1967)
 
 
 [19]
 Title 29 U.S.C. 158(c)-- 'The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.'
 
 
 [20]
 2 Legislative History, National Labor Relations Act, 1947, p. 1541 (Government Printing Office 1948)
 
 
 [21]
 2 Legislative History, National Labor Relations Act, 1947, p. 1624 (Government Printing Office 1948)
 
 
 [22]
 Cf. Linn v. United Plant Guard Workers, etc., 383 U.S. 53, 62 n. 5, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)
 
 
 [23]
 Darlington Mfg. Co., 165 NLRB No. 100, 65 LRRM 1391, 1397 (1967)
 
 
 [24]
 Internal Union UAW etc. v. NLRB, 124 U.S.App.D.C. 215, 363 F.2d 702, 707 cert. denied, Aero Corp. v. N.L.R.B., 385 U.S. 973, 87 S.Ct. 510, 17 L.Ed.2d 436 (1966); Hendrix Mfg. Co. v. NLRB, 321 F.2d 100, 103 (5th Cir. 1963). But cf. NLRB v. Colvert Dairy Products Co., 317 F.2d 44 (10th Cir. 1963); NLRB v. Rockwell Mfg. Co., 271 F.2d 109 (3rd Cir. 1959), where protected statements could not be used to appraise the credibility of witnesses, or to find otherwise proper interrogatories and statements coercive
 
 
 [25]
 The trial examiner did not credit or discredit this testimony. Concerning it he said:
 'The statements of purpose are negative, and whoever would regard them with skepticism cannot rely on them as proving the contrary. The testimony now received from the Darlington directors and stockholders supports the original finding that Darlington would not have been liquidated in 1956 but for the Union and its election victory.'
 
 
 [26]
 Darlington Mfg. Co., 165 NLRB No. 100, 65 LRRM 1391, 1399 (1967). The Board had previously found and unequivocally stated 'that the election of the union was a substantial cause of the plant's closing.' Darlington Mfg. Co., supra 65 LRRM at 1394. Anti-union animus need not be the sole cause of the employer's conduct in order to establish a violation of 8(a)(3). It is sufficient if it is the moving cause, a substantial cause, or the immediate cause. See Filler Products, Inc. v. NLRB, 376 F.2d 369, 377 (4th Cir. 1967); NLRB v. Associated Naval Architects, Inc., 355 F.2d 788, 792 (4th Cir. 1966); and NLRB v. Preston Feed Corp., 309 F.2d 346, 350 (4th Cir. 1962)
 
 
 [27]
 Darlington Mfg. Co. v. NLRB, 325 F.2d 682, 691 (4th Cir. 1963) (dissenting opinion)
 
 
 [28]
 See Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 273 n. 19, 85 S.Ct. 994, 13 L.Ed.2d 827 (1967); NLRB v. Preston Feed Corp., 309 F.2d 346, 350 (4th Cir. 1962)
 
 
 [29]
 Darlington Mfg. Co., 165 NLRB No. 100, 65 LRRM 1391, 1405 (1967)
 
 
 [30]
 Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 276, 85 S.Ct. 994, 1003, 13 L.Ed.2d 827 (1965)
 
 
 [31]
 Darlington Mfg. Co., 165 NLRB No. 100, 65 LRRM 1391, 1403 (1967)
 We have considered the petitioners' attack on the credibility of these witnesses. Although discrepancies appear in their testimony, the Board's conclusion that the discussion of Darlington's closing was widespread throughout the other plants was clearly warranted. The witnesses testified to events that occurred almost a decade before. Recognizing this difficulty, the trial examiner said: 'Should detailed findings concerning each witness' testimony be deemed necessary, although I deem it unlikely where the sum total is so slight, they can be made free of my own impression of inadequacies and without any confirmatory evaluations of witnesses' demeanor.'
 
 
 [32]
 Cf. NLRB v. Brown, 380 U.S. 278, 286, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); Local 357, International Brotherhood of Teamsters etc., v. NLRB, 365 U.S. 667, 677, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961) (concurring opinion); Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. NLRB, 347 U.S. 17, 42, 74 S.Ct. 323, 98 L.Ed. 455 (1954)
 
 
 [33]
 Radio Officers Union, etc. v. NLRB, 347 U.S. 17, 50, 74 S.Ct. 323, 98 L.Ed. 455 (1954). Cf. NLRB v. Associated Naval Architects, inc., 355 F.2d 788, 791 (4th Cir. 1966); Hendrix Mfg. Co. v. NLRB, 321 F.2d 100, 105 (5th Cir. 1963)
 
 
 [34]
 Darlington Mfg. Co., 139 NLRB 241, 253, 51 LRRM 1278, 1284 (1962)
 
 
 [35]
 Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 275, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)
 
 
 [36]
 Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 267 notes 5 and 6, 268 note 8, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)